## In re JULIUS BROS.

### (Circuit Court of Appeals, Second Circuit. August 10, 1914.)

### No. 203.

1. BANKRUPTCY (§ 100*)—ADJUDICATION IN INVOLUNTARY PROCEEDINGS—EFFECT AS ESTOPPEL.

If a petition in involuntary bankruptcy charges different acts of bankruptcy, and the adjudication does not show upon which one it proceeded, it does not render either charge res judicata in the further proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 60, 131, 141-144; Dec. Dig. § 100.*]

2. BANKRUPTCY (§ 407*)—GROUNDS FOR REFUSING DISCHARGE—FRAUDULENT TRANSFER OF PROPERTY.

The provision of Bankr. Act 1898 (Act July 1, 1898, c. 541) § 14b (4), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as added by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1911, p. 1496), making a transfer of property by a debtor, within four months prior to bankruptcy, with intent to hinder, delay, or defraud his creditors, ground for denying a discharge, includes two classes of transfers: First, those made with actual fraudulent intent; and, second, those where from the terms of the agreement, or the nature of the transaction itself, the fraudulent intent is presumed as an inference of law. But a bona fide transfer of property for a valuable consideration is not within the provision, although it may in fact hinder and delay creditors, or result in a preference; the statute recognizing the distinction between an intent to defraud and an intent to prefer, which latter is not made ground for denial of a discharge.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729-731, 737, 738, 740-751, 758, 760, 761; Dec. Dig. § 407.*]

3. BANKRUPTCY (§ 407*)—RIGHT TO DISCHARGE—FRAUDULENT TRANSFER OF PROPERTY.

The sale and transfer by the members of an insolvent mercantile partnership, within four months prior to bankruptcy proceedings against them, of all their property for its full value to a corporation organized by friends, who were not creditors, for the purpose of making the purchase, and the placing of the proceeds in the hands of an attorney to be used in discharging their indebtedness as far as possible, without preference, by payment of his pro rata share to each creditor who would accept the same in composition of his claim, was not a transfer with intent

to hinder, delay, or defraud creditors, which barred the right of the partners to a discharge under Bankr. Act 1898 (Act July 1, 1898, c. 541) § 14b (4), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1911, p. 1496).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729–731, 737, 738, 740–751, 758, 760, 761; Dec. Dig. § 407.*]

Appeal from the District Court of the United States for the Southern District of New York.

This is an appeal from an order and decree entered in the United States District Court for the Southern District of New York denying the petition of George Julius and Simon Julius trading as Julius Bros., bankrupts, for their discharge. This decree was entered on October 24, 1913.

The bankrupts are brothers and were engaged as copartners in the manufacturing of waists in the borough of Manhattan, in the city of New York, under the firm name of Julius Bros. On June 7, 1910, the entire stock in trade, machinery, fixtures, and accounts receivable were transferred by bill of sale to a corporation organized for the purpose by friends of the bankrupts, none of whom were creditors. The purchase price, $1,550, was put into the hands of their counsel to distribute among such of the creditors as were willing to accept 25 per cent., and was paid over to all the creditors with the exception of the two protesting creditors. The nonassenting creditors thereafter obtained judgments against the bankrupts. On July 23, 1910, Peter Pressman obtained judgment for $599.45. On July 27, 1910, Frank & Sons obtained judgment for $405.71. Executions were returned unsatisfied. These creditors, in conjunction with one Herzog, on a claim for costs assigned to him, thereupon filed a petition in involuntary bankruptcy, on September 15, 1910, and adjudication was ordered on September 30, 1910. Schedules were filed January 13, 1911, setting out as sole liabilities the above judgments and no assets.

For opinion below, see 209 Fed. 371.

Malcolm Sundheimer, of New York City, for appellants.

Harry L. Herzog, of New York City, for appellees.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The discharge of the bankrupts has been refused, and we are asked to determine on this appeal whether error was committed in denying them their discharge. The granting of a discharge is not a matter which is optional or discretionary with the court. The statute provides that the judge shall hear the application for a discharge and shall discharge the applicant unless statutory cause for refusing the discharge is shown. It is made the duty of the court to refuse to discharge a bankrupt if it appears that he has "at any time subsequent to the first day of the four months immediately preceding the filing of the petition, transferred, removed, destroyed or concealed or permitted to be removed, destroyed or concealed, any of his property with intent to hinder, delay, or defraud his creditors." Bankr. Act 1898, § 14b, as amended by Act Cong. Feb. 5, 1903, 32 Stat. 797.

It is necessary, therefore, to consider whether the bankrupts did within four months of the filing of the petition in bankruptcy make a

transfer of their property with intent to hinder, delay, or defraud their creditors within the meaning of the Bankruptcy Act. The special master thought they had, and his finding was confirmed by the District Judge. We think both the special master and the District Judge reached the conclusion with no little reluctance. The special master stated that he was "satisfied that these bankrupts made an honest failure and an honest attempt to settle, but the method of settlement adopted was at fault." And the District Judge in his opinion said, after stating that the transfer was "fraudulent" within the meaning of the act and that notwithstanding the fact that the bankrupts may have thought they had the right to make it "because fraud is not synonymous with personal sin, and a man may honestly justify quite illegal purposes. Nor is it one's inward justification of his conduct which counts, for this is not a court of conscience; it is wholly a question of whether the things proposed did in fact result in depriving the creditors of their rights."

In all that was done we have no reason to doubt the entire good faith of these bankrupts, and of their counsel, throughout the whole of this unfortunate difficulty. The bankrupts apparently made an honest failure, and acting under the advice of a committee of their creditors and a lawyer, who represented them and the majority of the creditors jointly they attempted, in order to save expense, to adjust their trouble through a common-law composition agreement. But unhappily a few of the creditors declined to agree to it. In all such cases a single creditor is in a position where he can make a good deal of trouble, if so disposed.

The other creditors, when they knew all the circumstances connected with the failure, were willing to accept 25 cents on the dollar and to settle their claims on that basis. The record shows that while the matter was pending Mr. Herzog, an attorney acting for certain creditors, went to see the attorney who was acting for the bankrupts, and stated to him that he would not consent to the proposed terms "unless he was going to get something in addition for his client"—that "whenever he got into a bankruptcy matter his client ought to be treated upon a separate basis or a better basis than anybody else, because when they represented creditors they were treated that way." He was informed that what he sought he could not obtain, that no one creditor would be given more than another, and that the settlement "was going through in the right way or it was not going through at all." To this Herzog is said to have replied that "he had to make a showing, and that the only showing he could make was to show dollars and cents, and by getting his clients a better settlement than anybody else." He was informed that there was money deposited for him "which would be available to him the same as anybody else." To this he replied that he would not take it, "but would fight the thing through the court, and made various threats." The record also discloses that one of the objecting creditors stated to the attorney for the creditors' committee that he would sign the composition agreement of 25 cents "cash extra on the side." The proposal was indignantly rejected.

Instead of coming into the bankruptcy court and offering a composi-

tion in the statutory manner, thereby avoiding any attempt of one creditor to secure an advantage over another, a plan had been conceived of forming a corporation to purchase the assets of this insolvent partnership for $1,500.

The creditors' committee had reported that "everything was worth about $1,250," but "they wanted to make it a round sum, and they thought, if we could pay 25 cents on the dollar cash, all the creditors would come in, and that is how the sum of 25 cents cash was arrived at. That was the way that was arrived at, and that amounted to $1,-550." The consideration, therefore, amounted to a few hundred dollars in excess of what the creditors' committee thought the assets were worth at the time. Four individuals, none of them creditors, but each a friend of the bankrupts, furnished this money and received in return stock representing that amount in the new corporation.

[1] The petition upon which Julius Bros. were adjudged bankrupts alleged two grounds for proceeding against them in involuntary bankruptcy:

(1) That these persons had transferred their property with intent to hinder, delay, or defraud their creditors.

(2) That while insolvent they transferred their property with intent to prefer creditors.

Julius Bros. did not appear or interpose any defense, and they were accordingly duly adjudicated bankrupts. From that decree no appeal was ever taken, and it must be taken as having conclusively established their status as bankrupts; the court having had jurisdiction. But the rule is that if the petition charges different acts of bankruptcy, as it did in this case, and the adjudication does not show upon which one of them it proceeded, and that is the case here, it does not render either charge res judicata in the further proceedings. In re Letson, 157 Fed. 78, 84 C. C. A. 582 (1907).

When the bankrupts subsequently and in due course asked for their discharge, it was refused, on the ground that they had made a transfer of their property with intent to hinder, delay, and defraud creditors; and from this order the appeal has been taken, and that question is therefore properly before this court, and is now to be determined.

[2] The courts make a distinction between a conveyance intended to hinder, delay, and defraud creditors and one executed with an intent to prefer some creditors over others. The Bankruptcy Act recognizes such a distinction between the intent to defraud and the intent to prefer. See Van Iderstine v. National Discount Co., 227 U. S. 575, 582, 33 Sup. Ct. 343, 57 L. Ed. 652 (1913). There is no necessary connection between the two. The act provides that a bankrupt shall be denied his discharge if he has transferred his property with intent to hinder, delay, or defraud his creditors; but it does not refuse him his discharge, if he has made a conveyance for the purpose of giving a preference. Under certain circumstances, if he has given a preference, the transfer may be avoided, and the fact that a preference has been given is in itself an act of bankruptcy. And the sole question

now is, not whether the transfer gave a preference, but whether it was made with the intent to hinder, delay, or defraud creditors.

The words used in the act, "with intent to hinder, delay or defraud his creditors," have been borrowed from the statute of 13 Eliz. c. 5, relating to fraudulent conveyances, and have no doubt the same meaning in the Bankruptcy Act that the courts have given to them when used in the statute of Elizabeth. It is noteworthy that the old English statute, after enacting that transfers made with intent to hinder, delay, or defraud creditors should be "utterly void," went on to provide that this rule should not apply to bona fide transfers for a good consideration, and the courts have construed "a good consideration" in this connection to mean one founded on value. In the case at bar the transfer was made in entire good faith and for a valuable consideration.

The intent to defraud is something distinct from the mere intent to delay or hinder. But there is no distinction between delaying and hindering. The statute must be construed according to its reasonable intent and object, "and by a reasonable construction only such hindrance and delay as will operate as a fraud come within its operation." Bump on Fraudulent Conveyances (3d Ed.) p. 20. This author, after stating that the presence of intent is essential, goes on to explain that:

"The transfer must also be devised and contrived of malice, fraud, covin, collusion, or guile." Id. p. 22.

There are two classes of transfers under the act:

(1) Those which have been entered into with actual fraudulent intent.

(2) Those where, from the terms of the agreement or the nature of the transaction itself, the fraudulent intent is presumed to exist as an inference of law.

In the one class the fraudulent intent is always a question of fact, and in the other it is a question of law. Thus if one who is insolvent makes a voluntary transfer of his property, receiving no valuable consideration therefor, the law will infer the intent, even though he may have made the transfer with an honest motive. In such cases no evidence of intention can be received to change that presumption. Such a conveyance necessarily operates to hinder, delay, or defraud the creditors, and the grantor will in such a case be presumed to intend the natural and necessary consequences of his acts.

The law applicable to the facts of the case now before us may be found correctly laid down in the following statement:

"One in debt may sell his property, although the effect of the sale is to hinder creditors, if the sale is not made for that purpose, and a debtor, although in failing circumstances or insolvent, may dispose of his property in good faith to obtain money to meet his obligations, although such sale may in fact hinder and delay his creditors." 20 Cyc. 464, 465, and cases cited.

[3] We think this principle is decisive of this case. There was no intent to defraud, and no intent to hinder or delay, creditors. On the contrary, the intent was to sell the property for full value and use the entire proceeds to discharge as far as possible the obligations of the debtors, without a preference to any one over another.

The Supreme Court of Massachusetts more than 100 years ago had a case before it which in principle resembles that now before the court. In Hatch v. Smith, 5 Mass. 42 (1809), it appears that one Smith was insolvent, but desirous of satisfying his creditors, as far as the circumstances permitted. He decided that, if there was a general assent on the part of his creditors, he would make an assignment of the bulk of his property, probably all except his household furniture, to be equally paid pro rata to and among such creditors as should become parties to the agreement. The creditors were to release Smith from any further liability to them. The creditors generally assented, and the transfer of the property was made. One of the creditors, the plaintiff, Hatch, refused his assent. The transaction was entered into with deliberation, apparent fairness, and no corrupt intention. There was no resulting trust of any kind for the benefit of Smith, the insolvent. There was an absolute conveyance of Smith's interest to the use of such creditors as were parties to the contract. The amount of the debts due from the insolvent greatly exceeded the value of the property conveyed for their satisfaction. It is not necessary to consider the various objections which were made to this arrangement by the objecting creditor. They were carefully considered by the court and all were regarded as untenable. The conclusion of the court was stated as follows:

"We do not think that the contract between Smith and his creditors can be construed to have been made with an intent to defeat or delay his creditors."

In the course of the opinion the court made the following statement, which we adopt and apply to the case now before us:

"There was certainly nothing wrong, when Smith found himself in insolvent circumstances, to disclose his situation to his creditors, and to propose to pay them, in equal proportion, as far as his ability extended, and to obtain therefor a discharge from his debts. On the part of his creditors there was nothing iniquitous in acceding to such a proposal. And if there were any of Smith's creditors, who disliked the terms which were offered, and preferred the chance of obtaining satisfaction by other means, it was competent and right for them to refuse. But there seems no good reason why such refusal should prevent Smith and the other creditors from executing an accommodation, which appears so humane and just. Still, however, if any of the reasons, offered on the part of the plaintiff, are available to the purpose, for which they were intended—to show that the contract is void, as it respects the creditors who are not parties to it—the plaintiff must prevail, and the persons summoned as trustees adjudged to be so."

The learned District Judge seems to have relied upon South Danvers National Bank v. Stevens, 5 App. Div. 392, 39 N. Y. Supp. 298 (1896), where the Appellate Division of the Supreme Court of New York said:

"In addition, we think, with the learned trial judge, that the assignment was fraudulent in fact. There is no doubt as to a debtor's right to go to creditors with a view of effecting an amicable settlement, and in the course thereof informing such creditors that a failure to compromise will necessitate an assignment. But this is quite another thing from doing what was done here, namely, formally executing an assignment and then using it as a weapon for the purpose of coercing a creditor into an agreement by which he gives to the committee having charge of carrying out a composition the right to discharge the debt, and thus foregoing the right which the creditor has, not only to receive a distributive share of his debtor's property, but also to proceed for the balance against such debtor."

That statement must be construed in the light of the facts as they existed in the case then before the court. A partnership was insolvent, and in September, 1891, made an agreement in writing with its creditors that it would place its affairs in the hands of a committee of its creditors, who should realize upon its assets and divide the proceeds equitably among the creditors. One of the creditors declined to accede to the arrangement, and began an action against the parties on a note given by them. That action was commenced in March, 1892. Thereupon the committee of the creditors suggested that the firm make a general assignment, so that the creditor who had commenced the action might not secure a preference, and on June 16th the assignment was executed, and the attorney for the firm at once informed the plaintiff's attorney that the assignment had been made and *would be used unless the plaintiff made a settlement.* No agreement was reached and the plaintiff recovered his judgment on July 7th, and on the next day the assignment was filed. It was perfectly evident that the purpose of the assignment was to force the plaintiff to make a settlement. Such an assignment, of course, could not be sustained. Its very purpose was to hinder and delay the creditor. But the facts in that case are so entirely unlike the facts in the case at bar that the decision is not applicable to the present case.

In Sargent v. Blake, 160 Fed. 57, 61, 87 C. C. A. 213, 217 (17 L. R. A. (N. S.) 1040, 15 Ann. Cas. 58 (1908), an insolvent partner conveyed his interest in the partnership property to his partner, and the latter immediately thereafter paid to the mother of the insolvent $3,731.90 for the money which she had loaned to the son to put into the partnership business. There was no intent on the part of either partner to hinder, delay, or defraud creditors to any greater extent than the payment to the mother would necessarily hinder or prevent them from collecting their debts. The Circuit Court of Appeals in the Eighth Circuit held that the transfer was not illegal, as having been made with intent to hinder or defraud the creditors, and said, through Judge Sanborn:

"The only evidence that Maxwell intended to hinder or defraud the creditors of the partnership is that, while the firm and the partners were insolvent, King conveyed his interest to Maxwell, and the latter paid his mother in preference to his other creditors. The only way in which Maxwell could have made this payment in bad faith would have been to have made it in whole or in part in secret trust for himself, or with the actual intent to hinder or defraud the creditors of the company more than the mere payment of the debt to his mother out of the property of the former partnership, in preference to the claims of the partnership creditors, must necessarily have delayed or prevented their collection of their claims, and there was no evidence of any such trust or intent. The evidence was that he intended to pay his mother in preference to the partnership and to other creditors, that his mother had loaned him the money to engage in and conduct the partnership business, that he had purchased the interest of his partner, and that, as soon as the business and the property became his, he paid her the debt which he owed her. The facts that the payment to Mrs. Sargent had the inevitable effect to deprive the creditors of the partnership of an opportunity which they would otherwise have had to collect their claims in whole or in part, and that Maxwell knew that this would be its effect, and hence must have intended that result, do not establish the fact that he intended to hinder, delay, or defraud those creditors within the meaning of

section 67e. It is every intent to hinder, delay, and defraud creditors unlawfully only, not every intent to hinder or delay them in collecting, or to prevent them from collecting, their claims, that avails to avoid a transfer under that section. An insolvent debtor has the jus disponendi of his property until the commencement of proceedings in bankruptcy against him. He has the legal right to secure and pay his debts with it, provided always the security or the payment is not violative of any of the acts of Congress or any of the laws of the land. A preference of one creditor over others by such a payment or by such security, which is free from actual or constructive fraud, and from any purpose to affect other creditors injuriously beyond the necessary effect of the security or preference, is valid and lawful, and it cannot evidence such intent to hinder, delay, or defraud creditors as will make it void or voidable under section 67e. Coder v. Arts, 152 Fed. 943, 947, 82 C. C. A. 91 [15 L. R. A. (N. S.) 372]; Sabin v. Columbia River Lbr. & Fuel Co., 25 Or. 15, 34 Pac. 692, 695, 42 Am. St. Rep. 756; Lampson & Powers v. Arnold, 19 Iowa, 479, 484; Stewart v. Dunham, 115 U. S. 61, 66, 5 Sup. Ct. 1163, 29 L. Ed. 329."

So in the case at bar we regard it as a matter of no consequence, as far as the precise question now under consideration is concerned, that the sale of the assets at their full value may have hindered or delayed the protesting creditors. There was no intention to defraud the creditors; neither was there any intention to hinder or delay them, or to force them to a settlement. If as a result they have been hindered and delayed, it is nothing more than the inevitable result which follows from the sale by an insolvent, where the proceeds are used to pay certain creditors in preference to others. Such sales under certain circumstances can be set aside on the ground of the preference, but in the absence of the fraudulent intent they do not warrant the court in refusing to discharge the bankrupts. The insolvents had the jus disponendi of the partnership property at the time, and they transferred it to pay partnership debts. The plan to form the corporation and to purchase the assets for $1,550 and to pay all the creditors 25 cents on the dollar, including the two objecting creditors, was conceived before the interview with the attorney for the objecting creditors was held, at which the latter declined to consent to the settlement because his demands for a secret additional sum beyond that to be paid to the other creditors was refused, and a few days afterwards the corporation was organized in accordance with the previous understanding. The course the objecting creditors took had no influence whatever upon what was done by the insolvent partners, who were acting with the approval of the creditors' committee.

The decree below must be reversed, and the cause remanded, with directions to grant the bankrupts their discharge; and it is so ordered.