### In re SHAPIRO & ORNISH.

District Court, N. D. Texas, Dallas Division.
January 23, 1929.

No. 2610.

Emil Corenbleth, of Dallas, Tex., for the bankrupts.

Fred J. Dudley and Dabney, Goggans & Ritchie, all of Dallas, Tex., for the creditors.

ATWELL, District Judge. At a meeting certain creditors decided to contest the discharge of the partnership and the individuals and directed the trustee to file specifications. These specifications rather generally object to the bankrupt's application because it is alleged they made preferential payments to the North Texas National Bank, having a fund concealed somewhere, and failed to satisfactorily account for assets. The trust fund specification is merely assumed from facts which tend to show the disposition of a large amount of merchandise, at special sales, during the last two or three months before the filing of the petitions. There is no evidence upon which one may place his finger to substantiate or support this objection.

The other two are less nebulous. Irrefutable proof of the payments to the bank is in the record. That institution received $9,000 in various payments just a short time before the firm closed its doors. Some of the indebtedness was not due. That those payments were preferential within the terms of the law is not proven, the bank does not seem to have had any knowledge or intimation, for that matter, that the firm was insolvent, though one of the officers of the bank testified that he did have an inquiry from a seller of merchandise; to the cautious careful banker such an inquiry might have caused an arching of the eyebrows.

The record is full, however, of unsatisfactory information showing the sacrificial sale of vast quantities of merchandise. The bankrupts contend that all of these sales were made for cash and much below cost. The sales were evidently cash sales, but whether the merchandise was sold above or below cost is proven only and solely by the bankrupts themselves, and their attitude in the entire matter is such that any statement they make should be carefully weighed.

On the 1st of January, 1928, according to a statement made by the bankrupts to a commercial agency, for the purpose of securing credit, they showed more than $27,000 in merchandise, more than $6,000 in cash, and a comfortableness in the individual situations. During the year they bought more than $90,-000 worth of merchandise, and turned over to the trustee about $25,000 worth, with $60 in cash on hand. The year's business shows a discrepancy of thousands of dollars. The only explanation that is afforded by the bankrupts is that during the last few months of the year, after there had been a water damage to one of their stocks, by reason of an overflow from a beauty shop on the upper floor, they sold merchandise below cost, and that the expenses and the water damage and the undercost sales furnish the reason for the discrepancy.

The record shows that within 60 days of the time of the filing of the voluntary petition each of the partners cashed in certain insurance policies; paid the balances upon two automobiles; settled the taxes upon their respective homes; paid various and sundry personal accounts; and one of them paid for a rather expensive pin for his wife. A part of this indebtedness, especially for the automobiles, was not yet due, and they secured cashier's checks from their bank which they took to another bank where they paid this undue paper.

Each of the partners also testifies that he did not know that the firm was insolvent until the day before they filed the petition. This testimony is manifestly untrue, because the record discloses that many creditors were pressing them, and, while it is probable that some of the Dallas representatives of these creditors had secured the claims by solicitation, which is a rather questionable habit, yet the fact remains that both partners knew of this serious financial embarrassment, and were evidently shaping their affairs to do exactly what they did do.

Neither of the partners was able to give any fixed figure as the percentage at which they sold below cost. The record shows that sometimes they said 10 per cent., and sometimes 15 per cent., and sometimes 50 per cent. The person whom they had to keep their books knew nothing about the items that he put in the books, except what they gave him. He never checked the actual sales against the cash, nor did he know whether the sales exceeded the sale tickets that the partners gave him to enter. The figures furnished by the bankrupts themselves, if taken in lump, do show the losses that they claim, but no one can feel safe in accepting the same as correct.

The store at 1008 Elm street, where the water damaged goods were on sale, also, according to the bankrupts, was used as a place for the sale of other merchandise.

Here is a sample of the explanation:

"Q. Now you were depositing all of the money taken from the sale of merchandise in the North Texas National Bank. A. Yes, sir.

"Q. Less what, if anything? A. Less expense.

"Q. Paid out in cash? A. Yes, sir.

"Q. Now during the month of October, November, and December your firm had on a sale? A. Yes, sir.

"Q. Why was the sale being put on at that time? A. To raise money to pay creditors.

"Q. Was it an ordinary sale like you have every year? A. No, sir.

"Q. What kind of a sale was it? A. A half price sale.

"Q. What do you mean by that? A. We called it a half price sale.

"Q. Were you selling your merchandise at half price? A. No, sir, not exactly half price.

"Q. Were you selling your merchandise at wholesale price, at half, or, what it cost you? A. No, sir.

"Q. About what were you selling it for? A. About ten or fifteen per cent. below the cost; some at cost, and some we made a little profit on.

"Q. What percentage did you sell below cost? A. Ten or fifteen per cent. below cost.

"Q. Of the wholesale cost? A. Yes, sir.

"Q. During October, November and December? A. Yes, sir.

"Q. That was true at all of the stores? A. Yes, sir, at the other store we sold below that, that was at 1008 Elm street.

"Q. You didn't sell anything down there below cost except that damaged merchandise? A. Yes, sir, we sold standard merchandise below cost.

"Q. You had other merchandise that was not damaged? A. Yes, sir, we sold it in the same way we did in the other store.

"Q. The store that you were conducting down there as a damage sale store, at 1008 Elm street, you would take merchandise, not damaged, out of the other store, and sell it below cost? A. We took some hard merchandise over there we sold fifty per cent below cost, for any price we could get to get rid of hard stuff."

Again:

"Q. Your firm had quite a net worth January 1st, 1927, didn't it? A. Yes, sir.

"Q. About $40,000.00, according to your statement, or more? A. Net worth?

"Q. Yes, or more, in your statement of January 1st., 1927, you show a total net worth of $42,000.00, of which amount the two homesteads were listed at $23,000.00, leaving a net worth of the business of $19,492.13; now from that time up to the time you went into bankruptcy that was completely wiped out, wasn't it? A. Yes, sir.

"Q. And you find yourself owing over $60,000.00? A. Yes, sir.

"Q. What explanation have you to offer of that situation? A. Well, the only explanation is we sold merchandise at cost and below cost, and the expenses eat us up; we had an awful big expense. * * *

"Q. This loss took place since July, is that correct? A. Yes, sir.

"Q. Since July, 1927, you lost your net worth, and your mercantile indebtedness has increased from $9,000.00 for merchandise to the amounts shown in your schedules, namely, $61,632.94. A. Yes, sir.

"Q. And does not take into consideration what you owe to the bank and what has been paid the bank; how is that possible? A. Well we must have taken a big loss on the merchandise, and we had an awful big expense. * * *

"Q. That makes a total amount of merchandise for the year, counting your inventory, of $86,555.62? A. Yes, sir.

"Q. Now you turned over to your trustee $25,096.33, in merchandise, leaving $61,458.29, merchandise disposed of. Now, in the face of that, and your testimony, that you had no sale below cost until July, what do you say happened to this merchandise? A. Well, figuring the amount of business we did since July, figuring the loss we have taken on it, and water damaged goods, all expense, I believe that will cover it."

Again:

"Q. You are one of the members of the firm? A. Yes, sir.

"Q. Can you tell this court the financial condition of this business during any month? A. No, sir.

"Q. Can your partner do it? A. No, sir.

"Q. Is there anyone you know that can? A. The book keeper is the only one."

Again:

"Q. Now, I think you stated a minute ago that you didn't know that the business was insolvent until a few days before bankruptcy? A. Yes, sir.

"Q. Is that right? A. Yes, sir."

On the 23d day of December, 1927, a very few days before the bankruptcy petitions were filed, undue indebtedness against two automobiles, owned respectively, by the two partners, was paid.

"Q. You paid for your automobile. A. Yes, sir, mine and Mr. Ornish's.

"Q. Then the sum of $1448.67 was payment on your automobile in full? A. Yes, sir.

"Q. Who held that? A. The City National Bank.

"Q. How much were you paying monthly on those automobiles? A. $97, or, $87, per month.

"Q. Was any of that indebtedness past due when you paid that off? A. I think some of it was.

"Q. You got a cashier's check for it? A. Yes, sir.

"Q. And paid the City National Bank, at Dallas? A. Yes, sir. * * *

"Q. What kind of a car was it you paid for yourself? A. A Buick.

"Q. How much did you owe? A. There was about one-half of this, a very little bit of difference.

"Q. And your partner, what kind of a car does he have? A. The same kind.

"Q. Was his note due too? A. Not all of it.

"Q. Then you just went down there and paid it off in full, although it was not due? A. Yes.

"Q. And you did that on the 23rd., of December? A. Yes.

"Q. And you paid the bank $2,000 about that time? A. To save interest on it."

Again:

"Q. Had you ever borrowed on your insurance policies prior to that time? A. No, sir, I did not.

"Q. That policy was about how old? A. One of them was about ten years old.

"Q. Did you borrow any money on any of the other policies? A. I have borrowed on all of them.

"Q. You borrowed on all of them? A. I wanted to cancel them at cost, I have other insurance. * * *

"Q. What did you use that money for, personal bills? A. I owed a fellow $400.00, and I paid him. * * *

"Q. Was it for borrowed money? A. No, he had a pin for me that amounted to a good deal more money, and the balance of $400.00.

"Q. What kind of a pin was it? A. For my wife.

"Q. A bar pin, something like that? A. Yes, sir.

"Q. With diamonds in it? A. Yes, sir.

"Q. You paid that bill and paid it with your insurance money? A. Yes, sir. * * *

"Q. Did you feel more kindly toward that particular creditor than you did any other creditor? A. Well it was a personal affair, a friend of mine, and I didn't want him to lose anything.

"Q. What made you think he was going to lose it? A. I didn't have the money otherwise to pay it. I had it and I paid it. * * *

"Q. The exact date you found yourself broke? A. About the 25th., or 26th., of December.

"Q. When did you make that information? A. I believe about the 26th.

"Q. Who was with you? A. By myself."

In November the bankrupt sent a large open mail order for additional merchandise.

It seems, beyond question, that the payments made to the North Texas National Bank, as complained of in one of the specifications, were for the purpose of "hindering, delaying and defrauding other creditors." November 10th they paid $3,000; December 12th, two payments of $500 each; December 16th two payments of $500 each; December 19th, two payments of $500 each; December 21st, two payments of $500 each; and December 23d, two payments of $1,000 each.

These extraordinary payments were made at a time when other creditors were importunate and pressing for money. They were also made within a little while of the bankruptcy.

I do not hold that these payments, even if they were preferential, would be a bar to a discharge. In re Julius Brothers (C. C. A.) 217 F. 3, L. R. A. 1915C, 89. There is a distinction between an intent to defraud and an intent to prefer. I merely call attention to the significance which may be given them when taken in connection with the failure to satisfactorily account for the evident loss of a large portion of assets, and therefore as an additional reason for saying that the burden that the new act puts upon the bankrupts has not been discharged, and the shrinkage in assets is so patent and so unreasonable, and so suspicious, as to force the court to conclude that the explanation demanded by the law has not been given.

The word "satisfactorily," as contained in the amendment referred to, may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or the shortage. He is satisfied. He no longer wonders. He is contented.

Leaving out of consideration the third specification, we have, then, evidence which demonstrates improper payments to a given party and unsatisfactory accounting for assets of great value. While the court does not pass upon what, if any other, results shall flow from these findings, it does feel that to discharge the bankrupts would, in the face of these discoveries, afford grave dissatisfaction with the efficacy of the machinery of the bankrupt law to protect creditors from partiality and from a dissipation or disappearance of property toward which they had a right to look for their claims.

Discharges will be denied.