In re Lois **ADLMAN, Bankrupt.**

BANK OF PENNSYLVANIA, Plaintiff,

v.

Lois **ADLMAN, Defendant-Appellant.**

No. 936, Docket 76–5003.

United States Court of Appeals, Second Circuit.

Argued April 23, 1976.

Decided Sept. 14, 1976.

Goldman, Horowitz & Cheron, Garden City, N. Y. (Jacob M. Goldman, Garden City, N. Y., and Matthew Feinberg, Hempstead, N. Y., of counsel), for defendant-appellant.

Crowe, McCoy, Agoglia & Zweibel, P. C., Mineola, N. Y. (Morris Zweibel, Mineola, N. Y., of counsel), for plaintiff-appellee.

Before MOORE, FEINBERG and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal from an order of the United States District Court for the Eastern District of New York, Thomas C. Platt, Judge, which affirmed a judgment of the Bankruptcy Court, Boris Radoyevich, Bankruptcy Judge, denying appellant, Lois Adlman, a discharge in bankruptcy pursuant to section 14c(4) of the Bankruptcy Act, 11 U.S.C. § 32(c)(4). The discharge was denied on the ground that appellant, within twelve months preceding the filing of her petition in bankruptcy, transferred property with the intent to hinder, delay or defraud her creditors.

The evidence presented at the hearing before the Bankruptcy Judge showed that appellant's husband, Edward C. Adlman, was engaged in 1972 and 1973 in the purchase and development of real property in Pennsylvania and was a general partner in

the limited partnership known as Leesport Gardens Company ("Leesport").

The Bankruptcy Judge found that Lois Adlman "is a housewife and that she was not engaged in any business. Her husband had put her in as a limited partner in Leesport but she did nothing other than sign the partnership certificate and go on a guaranty of the Bank's loan."

On October 23, 1972, Leesport obtained a loan from the Bank of Pennsylvania. In connection with this loan, appellant and her husband executed and delivered to the Bank of Pennsylvania a continuing guarantee of any loans which the bank might make to Leesport. Appellant testified that she executed this instrument at the request of her husband because her husband explained that it was something needed in business and that it was important to have both their signatures under the law of Pennsylvania.

During the year 1973, the financial position of Mr. Adlman deteriorated. On October 12, 1973, appellant sold the family home in Sands Point, New York, to which she had always held the title in her own name, to an aunt and uncle of her husband for the sum of $125,000, subject to a first mortgage. She realized approximately $60,000 from the sale. A lease was entered into between the Adlmans and the new owners, and the Adlmans continued to live in the house.

Appellant owned insurance policies on the lives of her husband and her father and was beneficiary of these policies. Under Section 166 of the New York Insurance Law, these policies constituted assets exempt from creditors.[1]

Shortly before and simultaneously with the closing of title, appellant drew checks on her checking account to pay $52,653.40 of loans outstanding on these insurance policies and to pay $7,663.22 in premiums on these policies. Appellant testified that she made these payments because her husband was in poor health and because she was concerned that the policies might lapse and that she would be unable to obtain other insurance. She testified, without contradiction, that her husband felt that eventually things would get better. She was not examined by the objecting creditor on whether she knew enough about her husband's affairs to know that he was insolvent or even on whether she knew the extent of his obligations, but only on whether she knew she was in "financial difficulty."

On March 22, 1974, approximately five and one-half months after the payment of these loans and premiums, appellant and her husband filed voluntary petitions in bankruptcy and were adjudicated bankrupts. Appellant's schedules showed liabilities of $4,091,725.20 and no assets other than life insurance policies having a face value of $275,000, which she claimed as exempt property under the New York Insurance Law.

On November 27, 1974, the Bank of Pennsylvania, one of appellant's creditors on a loan of $25,000, filed a complaint with the Bankruptcy Court objecting to appellant's discharge. See Bankruptcy Rule 404. The complaint alleged that appellant's husband

---

1. Section 166(1) of the New York Insurance Law provides in relevant part as follows:

"If any policy of insurance has been or shall be effected by any person on his own life in favor of a third person beneficiary, or made payable, by assignment, change of beneficiary or otherwise, to a third person, such third person beneficiary, assignee or payee shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person effecting the insurance. If any policy of insurance has been or shall be effected by any person upon the life of another person in favor of the person effecting the same or made payable, by assignment, change of beneficiary or otherwise, to such person, the latter shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person insured; if the person effecting such insurance shall be the wife of the insured, she shall be entitled to the proceeds and avails of such policy as against her own creditors, trustees in bankruptcy and receivers in state and federal courts."

But see also note 9 and accompanying text for an exception.

had submitted to the bank, with the knowledge and consent of appellant, false financial statements misrepresenting the assets and liabilities of appellant and her husband, and that the bank had relied on these statements in extending credit to the Adlmans. The complaint also alleged that the conveyance of the Sands Point house by appellant was made "without valid consideration" and with the purpose and intent of hindering, delaying and defrauding the creditors of appellant and her husband.[2] The Bankruptcy Judge found that appellant and her husband did not intend to deceive the bank in submitting financial statements, and he therefore dismissed those portions of the complaint which requested that a discharge be denied on the ground that appellant had submitted false financial statements. Appellant's husband was granted a discharge. However, the Bankruptcy Judge denied appellant a discharge on the ground that she had sold the Sands Point house, repaid loans on her life insurance policies and prepaid the insurance premiums with the intent to hinder, delay and defraud her creditors.

The Bankruptcy Judge found that at the time appellant sold the Sands Point house, she was insolvent because of her liabilities of $4,091,725.20, which arose from her guarantees of her husband's obligations. He further found that appellant's husband, in October 1973, had little or no income, that he was under tremendous financial pressure, and that he wanted to sell the Sands Point house "because he felt it would be the wisest thing to do at that particular time." Indeed, he found specifically "[t]hat the defendant sold the Sands Point house, which she continues to occupy with her husband, to David and Dorothy Adlman, on October 12, 1973, repaid loans on various policies of life insurance, and paid premiums, some in advance of their due dates, in order to secure protection for herself and her children."[3] He found that "[t]he husband had

had a history of illness." But he also found that she did these things "for the purpose of removing such assets from the reach of her creditors." He finally recorded both as a finding of fact and as a conclusion of law that the transfer of the house, the repayment of loans, and the payment of premiums were done "with the intent to hinder, delay or defraud her creditors, all as specified in Section 14c(4) of the Bankruptcy Act."

In the Bankruptcy Judge's memorandum opinion accompanying his decision, he seemed to assume that the $125,000 purchase price of the house was a fair consideration. Indeed, there was no evidence which indicated that the house was sold for less than fair consideration. He also recognized that almost $40,000 of the $60,000 paid to the insurance companies was apparently paid before receipt of money from the sale of the house and that only $20,147.12 was paid to the insurance companies on the day of the closing.

Apparently recognizing the validity of the sale of the house, standing by itself, the Bankruptcy Judge noted that appellant was under no personal obligation to repay the loans on the insurance policies, since they "are considered advancements of the sums payable under the policy and if not repaid are merely deducted from the amount payable when the policy, by its provisions, matures", and that the repayment of the loans did not enhance the bankrupt's estate available to her creditors. He made no specific finding that Mrs. Adlman was lying when she testified that she was afraid that the insurance might lapse. He concluded, nevertheless, that repayment of the policy loans was made "with actual intent to hinder, delay or defraud the bankrupt's creditors," supporting his conclusion by stating that "[i]t was plainly her intention to remove such funds from the reach of her

---

2. The complaint also alleged that "the sums purportedly paid to the bankrupt for the transfer of said property were used to pay the debts of the bankrupt and her husband to the prejudice of the creditors herein." But the Bankruptcy Judge failed to find that the transfer of

the house was, itself, a fraudulent transaction. The failure to so find was contrary to the gravamen of the complaint.

3. We note that no premium was paid more than 10 weeks before it was due.

creditors by placing the same in an exempt catagory." He cited as his authority *In re Hirsch*, 4 F.Supp. 708 (S.D.N.Y.1933). He also noted that the payments of the premiums could be set aside as fraudulent under Section 276 of the New York Debtor and Creditor Law, which makes fraudulent such conveyances as are made with actual intent to hinder, delay or defraud creditors.[4]

The Bankruptcy Judge made no finding of extrinsic facts to support the conclusion that there was an *actual* intent to defraud her creditors. He appears to have found sufficient ground for denying a discharge in the mere fact that her intention was to place the funds in the exempt category.

The District Court affirmed simply on the ground that "[t]he Bankruptcy Judge could well have and apparently did infer the requisite intent from such facts [the house sale, repayment of insurance loans and premium payments] along with all of the other evidence in the case." Though Judge Platt did not specify what the relevant "other evidence" was, he felt that he "must" accept the Bankruptcy Judge's findings of fact unless ·clearly erroneous under Bankruptcy Rule 810.[5] He made no independent review of the authorities.

■ We think the courts below incorrectly assumed that a transfer prior to bankruptcy of non-exempt assets *ipso facto* compels the conclusion that there was an *actual* intent to "hinder, delay or defraud creditors" and that such transfer compels denial

4. Section 276 provides as follows:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

5. One Court of Appeals, in reversing an affirmance of the District Court of findings of a Referee in Bankruptcy, indicated that whether property was conveyed under Section 14c(4) might be "an ultimate question of fact" to which the "clearly erroneous" rule would not apply. *Minnick v. Lafayette Loan & Trust Co.*, 392 F.2d 973, 977 (7th Cir. 1968). See *Stewart v. Ganey*, 116 F.2d 1010, 1013 (5th Cir. 1940); *In re Pioch*, 235 F.2d 903 (3d Cir. 1956); *Costello v. Fazio*, 256 F.2d 903, 908 (9th Cir. 1958).

of a discharge in bankruptcy under § 14c(4) of the Act. Hence we reverse.

■■ We begin with the well-accepted principle that the Bankruptcy Act was intended to permit the honest debtor to get a new start in life free from debt, and that section 14 of the Act must be construed strictly against the objectors and liberally in favor of the bankrupt. *In re Kokoszka*, 479 F.2d 990, 997 (2d Cir. 1973), aff'd sub nom. *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974); *In re Tabibian*, 289 F.2d 793, 795 (2d Cir. 1961); *Minnick v. Lafayette Loan & Trust Co.*, 392 F.2d 973, 977 (7th Cir. 1968).

■ More specifically, in order to deny a discharge under section 14c(4) of the Act, 11 U.S.C. § 32(c)(4), the court must find that property was transferred or removed with *actual* intent to hinder, delay or defraud creditors. *Halpern v. Schwartz*, 426 F.2d 102, 104 (2d Cir. 1970). Constructive fraudulent intent, such as would suffice to set aside a transfer under section 67 of the Act, 11 U.S.C. § 107, or under section 70e, 11 U.S.C. § 110e, cannot be the basis for the denial of discharge.

The distinction between constructive intent involved in a transfer without consideration while insolvent and "actual intent" to hinder, delay or defraud creditors is well recognized, though not always easy of definition. The difficulty of proving "actual intent" to defraud was made manifest in *Feist v. Druckerman*, 70 F.2d 333 (2d Cir. 1934), a decision concurred in by Judges Learned Hand, Swan and Augustus N. Hand.[6]

Both *Pioch* and *Costello* were noted by us in *In re Tabibian*, 289 F.2d 793, 795 (2d Cir. 1961).

6. In *Feist*, the bankrupt, several months before bankruptcy, obtained the full surrender value of an insurance policy he owned jointly with his brother and deposited his share of the proceeds in his personal account. Two months before the filing of the petition, he paid to his son $3500, which was virtually all the money he had in the bank at this time. Furthermore, several months prior to the filing of the petition, the bankrupt conveyed to his wife his entire interest in a lot worth $50,000, which he had owned jointly with his wife. This conveyance was made without consideration, and at the time it was made the bankrupt was apparently insolvent. The bankrupt stated that his wife had agreed to assume the $7,000 balance

The reluctance of the courts to find actual intent by a bankrupt to defraud his creditors is illustrated by decisions holding that the exchange by the bankrupt, on the eve of bankruptcy, of non-exempt property for exempt property, is not itself a fraud on his creditors and cannot be the basis for a denial of a discharge absent extrinsic evidence of fraud. *Forsberg v. Security State Bank,* 15 F.2d 499, 502 (8th Cir. 1926). See *Wudrick v. Clements,* 451 F.2d 988, 989–90 (9th Cir. 1971); *Grover v. Jackson,* 472 F.2d 589, 590 (9th Cir. 1973). As the court stated in *Forsberg v. Security State Bank, supra,* 15 F.2d at 502, "before the existence of [any] fraudulent purpose can be properly found, there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of non-exempt assets into exempt and which are indicative of such fraudulent purpose." [7]

In *Doethlaff v. Penn Mutual Life Insurance Co.,* 117 F.2d 582 (6th Cir.), *cert. denied,* 313 U.S. 579, 61 S.Ct. 1100, 85 L.Ed. 1536 (1941), it was held that the payment of life insurance premiums by a debtor who was insolvent did not constitute a fraud on creditors. We cited *Doethlaff* with approval in *Schwartz v. Seldon,* 153 F.2d 334, 336 (2d Cir. 1945), where this court upheld the exemption of a life insurance policy on the assumption that the bankrupt himself had paid off loans on the policy while insolvent. We stated that even if the bankrupt had repaid the loans, "the policy would not lose its exempt character unless the payment constituted a transfer made with 'actual intent' to defraud creditors, as required by § 166 [of the N.Y. Insurance Law] if exemption is to be defeated." *Id.*[8] We concluded that "the record contains no evidence justifying an inference of 'actual in-

---

of the mortgage which was on the property and to pay the arrears in taxes, amounting to $8,000. But the trial court "entirely disbelieve[d]" this testimony and found that there was no such understanding between the bankrupt and his wife. The trial court found that the bankrupt had actual intent to defraud his creditors by making the above-mentioned transfers, and set aside the transfer of the bankrupt's interest in the lot pursuant to Section 276 of the Debtor and Creditor Law. 6 F.Supp. 751 (E.D.N.Y.1933).

On appeal, however, this court, in an opinion by Judge Augustus N. Hand, found that the evidence was insufficient to warrant a finding of actual fraud. The court stated that

"[i]n view of the false statement of [the bankrupt] as to such a vital matter as an assumption by [his wife] of the mortgage and in view also of the transfer of property to his wife and son and of his conversion of his life insurance policy, all within six months of the filing of the petition in bankruptcy, there is some reason to hold that an inference of 'actual intent' to defraud creditors 'as distinguished from intent presumed in law,' should be drawn and that accordingly the conveyance should be set aside under the provisions of section 276 of the New York Debtor and Creditor Law."

But Judge Hand went on to state that

"[w]e are, however, inclined to think that the testimony when taken alone was not sufficient to prove actual fraud, and that a cause of action under section 276 of the New York Debtor and Creditor Law must fail."

70 F.2d at 334.

7. For an example of the type of extrinsic evidence needed to show actual fraud, see *Kangas v. Robie,* 264 F. 92 (8th Cir. 1920). In that case the bankrupt's claim to a homestead exemption was denied where the evidence established that he obtained the purchase price of the homestead by buying merchandise on credit immediately prior to bankruptcy and using the proceeds of the merchandise to buy the homestead, rather than pay his suppliers. As the Ninth Circuit noted in *Wudrick v. Clements, supra,* 451 F.2d at 990: "A different case would be presented if on the eve of bankruptcy a debt were created with no intention of repaying the creditor, either by purchasing goods on credit or borrowing money without security." In the instant case, by contrast, Mrs. Adlman paid the premiums and repaid the loans with money that was derived from an asset which she had owned for many years.

8. In *Schwartz v. Seldon,* repayments of loans on the bankrupt's life insurance policies were made while he was insolvent. The referee found that the *bankrupt* had repaid the loans "with actual intent to hinder, delay or defraud creditors" and entered an order that the bankrupt pay the trustee the amount of the loans or turn over the policies so that the trustee might realize the amount out of their cash surrender values. There was a question whether the *wife* of the bankrupt rather than the bankrupt himself had repaid the loans. The quoted passage is based on the alternative assumption by the court that the bankrupt, himself, had repaid the loans while insolvent.

tent' to defraud creditors." Furthermore, we noted that "[e]ven the conversion of nonexempt property into exempt property by an insolvent contemplating bankruptcy has been held a transaction not intended to defraud creditors in the absence of evidence of extrinsic fraud," citing *Forsberg v. Security State Bank, supra.* *Id.* at 337.

 In the case at hand, there is no evidence of any extrinsic fraud committed by the appellant in the payment of premiums on her life insurance policies and the repayment of loans. Indeed, the Bankruptcy Judge specifically found that appellant made these payments "in order to secure protection for herself and her children." It is true that the Bankruptcy Judge also found that these payments were made "for the purpose of removing such assets from the reach of her creditors" and "with intent to hinder, delay and to defraud her creditors." But it is evident that the Bankruptcy Judge misconceived the law in reaching these conclusions, since nowhere did he find any evidence of fraud other than the mere payments themselves, and his citation of *In re Hirsch, supra,* was, as we shall see below, reliance on an authority wrongly reasoned. Absent convincing evidence of extrinsic fraud, it was incorrect as a matter of law for the Bankruptcy Judge to conclude that appellant had actual intent to defraud her creditors. *See Schwartz v. Seldon, supra.* Although the judge may also have concluded as a matter of *fact* that appellant intended to defraud her creditors, we are not bound to accept such a finding, since it was induced by an erroneous view of the law. See *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Manning v. M/V "Sea Road",* 417 F.2d 603, 607 (5th Cir. 1969); 5A Moore, *Federal Practice* ¶ 52.02[2], at 2264.

Appellee argues, however, that under *New York* law, appellant's payments of loans on her policies and prepayments of premiums would be considered as having been made with actual intent to defraud creditors. Section 166(4) of the New York Insurance Law provides that "[e]very assignment or change of beneficiary, or other transfer, shall be valid, except in cases of transfer with actual intent to hinder, delay or defraud creditors, as such actual intent is defined by article ten of the debtor and creditor law . . . ."[9] Appellee argues that *Baxter House, Inc. v. Rosen,* 27 A.D.2d 258, 278 N.Y.S.2d 442 (2 Dep't 1967), indicates that New York courts *would* hold that the mere payment of premiums by an insolvent debtor, without more, constitutes actual intent to defraud creditors within the meaning of Section 166(4). We disagree.

*Baxter House* involved an appeal from the dismissal of a complaint. Rosen, it was alleged, paid premiums on a life insurance policy while insolvent "actually intending to defraud his creditors." The court below held that Section 166 applied only where there was an assignment of the policy or a change of beneficiary. 47 Misc.2d 77, 80, 262 N.Y.S.2d 378 (Sup.Ct. 1965). The Appellate Division reversed, holding that even though there was no such assignment or change of beneficiary a cause of action was stated for voiding the payment of the premiums. Since the complaint specifically alleged "actual intent," there was no occasion for the Appellate Division, in merely sustaining the complaint, to discuss the meaning of "actual intent." The case is inapposite. Indeed, we have seen that in *Schwartz v. Seldon, supra,* this court viewed New York law in a manner contrary to appellee's contention. Nor have we found later New York cases which cast doubt on that view of New York law.

**9.** Before the "actual intent" language came into § 166 of the Insurance Law, the former Section 55–a of the Insurance Law (McKinney 1937), enacted by [1927] N.Y. Laws, ch. 468, § 1, excepted only "cases of transfer with the intent to defraud creditors," without the word "actual." This court construed the earlier statute as well as the latter to except only transfers with

"actual intent." *Schwartz v. Seldon, supra,* 153 F.2d at 337. *Purvin v. Grey,* 294 N.Y. 282, 62 N.E.2d 72 (1945), may, perhaps, be thought *contra* with respect to former section 55–a, but the New York Court of Appeals disclaimed any intention of interpreting section 166(4), the statute now before us. *Id.* at 286, 62 N.E.2d 72.

It is worth noting that in *Doethlaff v. Penn Mutual Insurance Co., supra,* which we cited with approval in *Schwartz v. Seldon,* it was held, under an Ohio statute similar to the New York Insurance Law, that the payment by a bankrupt, while insolvent, of life insurance premiums was not in itself "in fraud of creditors."

As we have seen, the Bankruptcy Judge cited *In re Hirsch,* 4 F.Supp. 708 (S.D.N.Y. 1933), in support of his conclusion. There the District Court for the Southern District of New York held that the confirmation of a composition, equivalent to a discharge in bankruptcy, would be denied when the bankrupt had repaid loans on life insurance policies as well as prepaid premiums, upon the ground that the law will infer an attempt to defraud creditors from a voluntary transfer made without consideration and while insolvent. *Id.* at 710. The court distinguished *Forsberg, supra,* on the ground that the South Dakota statute made the property acquired wholly exempt, while the New York Insurance Law excepted payments made with intent to defraud creditors, which the court equated with mere transfer without proof of actual intent. *Id.* at 711. *In re Hirsch* cannot be reconciled with *Schwartz v. Seldon.* There we cited *Forsberg* with approval in a case involving the very New York statute at issue in *Hirsch,* as well as in the instant case.[10]

In any event, we need not decide whether the payment of premiums by a person who is insolvent can be set aside by the trustee on the ground that they were made in fraud of the rights of creditors. We only determine that the acts performed by the bankrupt housewife in this case were not of a sufficiently fraudulent character to bar her discharge.[11]

The order of the District Court affirming the Bankruptcy Judge's denial of a discharge is reversed, and the case is remanded to the District Court with instructions to grant appellant a discharge.

MOORE, Circuit Judge (dissenting):

The only issue on this appeal is whether Mrs. Adlman ("bankrupt") converted nonexempt property into exempt property *with intent to* "hinder, delay or defraud" her creditors under 11 U.S.C. § 32(c). Whether or not the bankrupt did act with such actual intent is a purely factual question, properly resolved by the trier of facts—here, the bankruptcy judge—and not subject to reversal on appeal unless clearly erroneous.[1]

Once the evidence established some reasonable ground to believe that the bankrupt acted with intent to defraud creditors in violation of § 32(c) (and I believe that the undisputed facts of the sale to and lease-back from relatives of realty with continued occupancy thereof, with proceeds used

10. The citation by the Bankruptcy Judge of *In re Julius Bros.,* 217 F. 3 (2d Cir. 1914), is hard to understand. This case reversed the denial of a discharge, holding that the making of a preference by a bankrupt does not constitute actual intent to hinder, delay or defraud creditors within the meaning of Section 14 of the Bankruptcy Act.

11. As the Third Circuit has said: ". . . it is not so much the acts of the bankrupt that will prevent his discharge as it is the intent with which he acts." *In re Pioch, supra,* 235 F.2d at 906. A higher degree of fraud is required to deny a discharge than to deny a claimed exemption. Thus, we have held, for example, that *culpable* intent must be found to justify denial to a bankrupt who has made "a materially false statement in writing respecting his financial condition." *In re Ostrer,* 393 F.2d 646 (2d Cir. 1968). As Judge Kaufman (now Chief Judge) said: "The provisions of the Bankruptcy

Act created the broad discharge medicament for the financially sick debtor." *Id.* at 649. In *Fallick v. Kehr,* 369 F.2d 899, 904 (2d Cir. 1966), Judge Feinberg recognized that "the Bankruptcy Act expresses a strong legislative desire that deserving debtors be allowed to get a fresh start," and Judge Friendly noted that "the discharge in bankruptcy . . . is 'social legislation' of the greatest consequence." *Id.* at 906 (dissenting opinion).

Of course, the engaging by the bankrupt in a "clear pattern of purposeful conduct" that was, itself, fraudulent, amply supports a finding of actual intent to defraud. *In re Freudmann,* 495 F.2d 816 (2d Cir.), *cert. denied,* 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974).

1. Rule 810, Bankruptcy Rules, 411 U.S. 1090; *McDowell v. John Dure Industrial Equipment Co.,* 461 F.2d 48, 50 (6th Cir. 1972); *In re Osborn,* 389 F.Supp. 1137, 1138 (N.D.N.Y. 1975).

to *prepay* life insurance premiums constituted such reasonable ground), the burden of proof shifted to the bankrupt to demonstrate to the court's satisfaction that a discharge was warranted. *In re Freudmann,* 495 F.2d 816, 817 (2d Cir.), *aff'ing* 362 F.Supp. 429, *cert. denied,* 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974). In making its factual finding, the bankruptcy judge was free to consider circumstantial evidence,[2] and was in the best possible position to determine the question of motive since the bankrupt testified in person and at some length before the court.[3]

In light of the record, it can hardly be argued that Bankruptcy Judge Radoyevitch's finding of actual intent was "clearly erroneous". On the contrary, it is amply supported by the testimony presented to the Court, and the undisputed facts alone are indicative of a scheme to defraud creditors. The sale and leaseback was not an arm's length transaction; the immediate conversion of the proceeds into exempt property was not for the purpose of paying premiums due and owing on the policy, but rather for the *prepayment* of future premiums. It is conceded that the bankrupt was counselled in this course of action by a spouse who was an experienced, albeit not necessarily successful, businessman. The court could fairly infer from all of the above that there was actual intent to place assets beyond the reach of creditors, and under such circumstances, discharge was properly denied.

I would affirm the lower court's denial of a discharge.

---

**2.** *In re Freudmann, supra,* at 362 F.Supp. 431.

**3.** *See In re Mimshell Fabrics, Ltd.,* 491 F.2d 21, 23 (2d Cir. 1974).