## In re WOODS.

### No. 213.

Circuit Court of Appeals, Second Circuit.
June 11, 1934.

Glass & Lynch, of New York City (Leslie Kirsch and Sydney W. Cable, both of New York City, of counsel), for appellant.

House, Grossman & Vorhaus, of New York City (Louis J. Vorhaus, Alfred Beckman, and Joseph Fischer, all of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

Albert H. Woods was adjudicated a bankrupt upon his voluntary petition filed October 21, 1931. In due time he applied for discharge from his debts. To this application Regain, Inc., a creditor, filed three specifications of objection, charging (1) the obtaining of an extension or renewal of credit upon a materially false statement in writing respecting his financial condition; (2) the making of a fraudulent conveyance within twelve months preceding the filing of his petition in bankruptcy; and (3) the failure to explain satisfactorily the loss of certain assets. Hearings were had before a special master. His report sustained the creditor's objections and recommended denial of a discharge. Such report the District Court refused to confirm; it found that the specifications of objection had not been sustained, and granted the discharge. This order is before us on appeal by the objecting creditor.

With respect to the first specification, relating to a financial statement given to a bank, it will suffice to say that the District Court found that the bank did not extend credit on the faith of the statement, and we can see nothing in the record which compels a reversal of that finding.

The second specification charges a transfer on June 11, 1931, to Messrs. Lee and J. J. Shubert of certain shares of stock with intent to hinder, delay, and defraud creditors. These shares constituted the entire capital stock of an Illinois corporation of which the bankrupt had been the sole shareholder for a number of years. The corporation owned a ninety-nine year leasehold, of which only a few years had run, covering a valuable hotel and theater building in Chicago, Ill. The leasehold was subject to a first mortgage which had been reduced from $525,000 to $240,000, and before Woods' bankruptcy it was further reduced to $223,000. The leasehold was also subject to a second mortgage for $150,000. For each of these mortgages the bankrupt was liable as guarantor or indorser of the mortgage notes. For some months a receiver had been in possession of the property under a foreclosure suit filed by the first mortgagee on account of the mortgagor's default in payment of taxes. There had, however, been no default in respect to interest or principal of the mortgage debt; and, despite the pending suit, the bankrupt considered the equity in the property of great value, for he listed it at $750,000 in a statement to the bank in January, 1931. In May, 1931, the Messrs. Shubert, who held the second mortgage, requested Woods to assign to them his stock in the mortgagor corporation to enable them "to keep alive the redemption of the property" in case the pending suit should proceed to a foreclosure sale. On June 11th he made the requested transfer. He received nothing in return except the Shuberts' agreement that, if the foreclosure suit should result in a sale and they should purchase the leasehold at such sale or acquire it from the purchaser on foreclosure, or if they should acquire or discharge the first mortgage, then Woods should have an option for a period of six months thereafter to purchase the leasehold from them on paying their expenditures, with interest, plus whatever might remain due them on the second mortgage. The Shuberts assumed no obligation to acquire the leasehold or to discharge the first mortgage, and no provision was made for a return of Woods' stock in case they did not do so.

The District Court considered this a valid business transaction which might have worked out to the bankrupt's advantage. With this view we cannot agree.

The stock represented the corporation's equity in the leasehold, and, in spite of the pending foreclosure suit, this appears to have been a valuable asset. In 1931 the property had an assessed value of $1,300,000. Up to 1929 the theater had paid the corporation $110,000 per annum and the hotel had paid an annual rental of $45,000. Woods had received an offer of $925,000 for the equity in 1929 and was then asking $1,100,000. As late as January, 1931, and while the foreclosure suit was pending, he valued it at $750,000. Even the contingent option which he obtained in exchange for the stock he listed in his bankruptcy schedules as an asset worth $300,000. Certainly outright ownership of the stock was far more valuable than the contingent and restricted rights given by the option. Necessarily, therefore, if the

272

equity in the leasehold had any substantial value, and there was no evidence in the record that it had not, the consideration given by the Shuberts for the assignment of the stock was inadequate, and consequently detrimental to Woods' creditors. Under section 14b of the Bankruptcy Act, as amended (11 USCA § 32), the burden of proving that he had not made a transfer in fraud of creditors within twelve months immediately preceding the filing of the petition was upon the bankrupt, provided the objecting creditors showed reasonable grounds for believing that he had done so. Inadequacy of consideration is generally held to be a badge of a fraudulent conveyance. See Lowenstein v. Reikes, 60 F. (2d) 933, 936 (C. C. A. 2); Draper v. Draper, 68 Ill. 17; Mathews v. Reinhardt, 149 Ill. 635, 645, 37 N. E. 85; First Nat. Bank v. Miller, 163 N. Y. 164, 57 N. E. 308; Oshry v. Haddad, 265 Mass. 199, 164 N. E. 69. The transfer of a valuable asset for a consideration so inadequate as this option certainly gives prima facie grounds for believing that the transfer was intended to hinder, delay, or defraud Woods' creditors—its necessary consequence. See In re Julius Bros., 217 F. 3, 7, L. R. A. 1915C, 89 (C. C. A. 2); In re Shapiro & Ornish, 37 F.(2d) 403 (D. C. N. D. Tex.), affirmed Shapiro & Ornish v. Holliday, 37 F.(2d) 407 (C. C. A. 5); Sinclair v. Butt (C. C. A.) 284 F. 568, 570 (C. C. A. 8).

It is argued, however, that in June, 1931, Woods was so hard pressed that he was contemplating bankruptcy and had no means to preserve the leasehold against the threatened foreclosure, and that the transaction with the Shuberts was entered into for their mutual advantage in that it enabled them to protect their junior mortgage and at the same time to preserve for Woods and his creditors the possibility of reacquiring the leasehold. But this argument will not bear close scrutiny. An Illinois statute makes provision for redemption from a sale on foreclosure by the mortgagor, and persons interested in the premises through or under him, within twelve months from the date of sale, and by judgment creditors within three months next thereafter. Smith-Hurd Rev. St. 1931, c. 77, §§ 16, 18 and 20, Callaghan's Ill. Stat. Ann. c. 77, §§ 16, 18, and 20. Under this statute the Shuberts as junior mortgagees had twelve months within which to redeem from a foreclosure sale of the first mortgage (Seligman v. Laubheimer, 58 Ill. 124, 125), and three months additional if they obtained a foreclosure decree under their own mortgage (Heinroth v. Frost, 250 Ill. 102, 95 N. E. 65). Thus they had statutory rights of redemption independent of ownership of the mortgagor's

stock, and the acquisition through such stock ownership of the mortgagor's right to redeem would not "keep alive" or extend their time, since the mortgagor must act within twelve months from the foreclosure sale. Nor, in all probability, would the transaction extend Woods' time to save his interest in the leasehold; on the contrary, it was more likely to shorten it. If the Shuberts themselves bought at the foreclosure sale, then Woods had but six months within which to purchase the leasehold from them, whereas, had he retained control of the mortgagor's right of redemption, he would have had twelve. Only in the event that the Shuberts redeemed from a foreclosure purchaser, or acquired his title by purchase, more than six months after the foreclosure sale, could Woods' option extend beyond the period of the mortgagor's statutory right of redemption. Moreover, the option was more onerous than redemption would have been because Woods had to find not only the amount expended by the Shuberts to redeem from the first mortgage but also whatever remained due on the second. Furthermore, the option was purely contingent. The Shuberts assumed no obligation to acquire the property; only in the event that they should do so, would rights under the option arise. Otherwise the stock was gone forever and with it all interest in the leasehold. These considerations make all the more apparent how illusory were the benefits which Woods might derive and how inadequate was the consideration paid for his stock.

The case of Devorkin v. Security Bank & Trust Co., 243 F. 171 (C. C. A. 6), which the bankrupt relies upon as bearing "a marked resemblance" to the case at bar, is different in two vital respects. There the equity in the mortgaged premises was shown to be substantially worthless; and, as the court pointed out at page 173 of 243 F., a deed to worthless property cannot be intended to hinder, delay, or defraud creditors. Moreover, there the grantee of the equity did assume an obligation to acquire the property and gave the grantor a two-year option to purchase it. Here, as already noted, the grantees of the stock assumed no such obligation and the option was likely to expire earlier than would the mortgagor's statutory right of redemption.

It is further suggested that at most the conveyance was merely the giving of a preference to the Shuberts and so no ground for refusing a discharge. But the transaction is not capable of that construction. Certainly the stock was not taken in payment of the

second mortgage, and it is equally obvious that it was not to be held as further security, for there was no obligation to return it except on the contingency that the Shuberts should redeem the property under the first mortgage and Woods perform the terms of his option. In all other contingencies the stock remained the property of the grantees without right of redemption by Woods and he remained liable as indorser of the second mortgage notes.

Consequently, since the bankrupt has not carried the burden of explaining away the prima facie case against him, it follows that the second specification should have been sustained and the discharge denied.

This conclusion makes it unnecessary to consider whether or not the loss of assets charged in the third specification was satisfactorily explained.

Order reversed.