In re Patrick J. CADARETTE,
Bankrupt.

EFA ACCEPTANCE CORPORATION,
Plaintiff-Appellee,

v.

Patrick J. CADARETTE,
Defendant-Appellant.

No. 819, Docket 79–5004.

United States Court of Appeals,
Second Circuit.

Argued April 4, 1979.

Decided June 18, 1979.

R. Cornelius Danaher, Jr., Hartford, Conn. (Danaher, Lewis & Tamoney, Hartford, Conn., of counsel), for plaintiff-appellee.

William R. Moller, Hartford Conn. (Moller & Horton, Hartford, Conn., Wesley W. Horton, Hartford, Conn., of counsel), for defendant-appellant.

Burton Carlson, Bristol, Conn., for defendant-appellant.

Before MULLIGAN, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

MULLIGAN, Circuit Judge:

The EFA Acceptance Corporation (EFA), a creditor, filed a complaint pursuant to Rule 404 of the Rules of Bankruptcy Procedure in the United States District Court of Connecticut opposing the discharge of Patrick J. Cadarette, the bankrupt. The complaint essentially alleged that Cadarette had violated section 14(c)(1) and (4) of the Bankruptcy Act (the Act), 11 U.S.C. § 32(c)(1), (4). After extensive hearings the bankruptcy judge found for Cadarette and held that the debt of EFA was dischargeable. On appeal the Hon. T. Emmet Clarie, Chief Judge, District of Connecticut, in a ruling dated December 14, 1978 reversed the order of the bankruptcy judge, holding that Cadarette had transferred property some three weeks prior to filing for bankruptcy with an "overriding intent to shield his assets from his creditors" in violation of section 14(c)(4) of the Act. In addition, Chief Judge Clarie found that Cadarette had violated section 14(c)(1) of the Act when he "knowingly and fraudulently made a false oath . . . in relation to a bankruptcy proceeding." The bankruptcy judge's factual findings to the contrary on both issues were found to be "clearly erroneous." Judgment in favor of EFA was entered on December 20, 1978 and this appeal by Cadarette followed.

## THE FACTS

There is no issue about the facts in this case which, in any event, are not complicated. From 1973 to 1977 the bankrupt worked full time for a printing corporation owned and operated by his father. After his father's death in the spring of 1977 the bankrupt continued to operate the business with decreasing financial success. In June, 1973 a Monte Carlo automobile was purchased in the name of the bankrupt who also signed the retail installment contract. In 1975 the bankrupt co-signed with his father two security agreements for the purchase of additional printing equipment financed by EFA. Following the death of his father Cadarette met with the president of EFA in an effort to find some means of solving the financial problems of the printing company. EFA's interest was prompted by the fact that it had endorsed promissory notes executed by the bankrupt and his father and would be liable if the company failed. The final meeting of Cadarette and the president of EFA was held on June 30, 1977. At that meeting Cadarette's deepening financial difficulties were discussed and the possibility of bankruptcy was mentioned.

On July 1, 1977, Cadarette made a gift of the Monte Carlo to his fiancee. At the same time he also made a gift to her of a boat and trailer registered in his name which had a value of $100. In July, 1977 Cadarette consulted his attorney and on July 20, a few days after meeting with his counsel, he filed the petition for bankruptcy. EFA made timely objections to the granting of the petition.

In the bankruptcy petition Cadarette answered the following two questions in the negative.

12(a) Have you made any gifts other than ordinary and usual presents to family members and charitable donations, during the year immediately preceding the filing of the original petition herein?

12(b) Have you made any other transfer, absolute or for the purpose of security, or any other disposition of real or

tangible personal property during the year immediately preceding the filing of the original petition herein?

Section 14(c) of the Bankruptcy Act, set forth in the margin,[1] precludes a discharge in this case if Cadarette either "knowingly and fraudulently made a false oath . . in relation to a bankruptcy proceeding,"[2] or "transferred, removed, destroyed, or concealed, any of his property with intent to hinder, delay, or defraud his creditors . . . ." It is uncontested that Cadarette transferred title to his automobile, boat and trailer without consideration three weeks before filing the petition and that his denial of making a gift or transfer of this property in his filed schedules was false when made. The determination of Cadarette's intent, therefore, was of crucial importance in the hearing before the bankruptcy judge. He found that the transfer of the automobile by Cadarette to his fiancee was made innocently and not for the purpose of defrauding his creditors. The bankruptcy judge acknowledged that the transfer of a valuable asset without consideration constituted *prima facie* proof of an intent to defraud. *In re Woods*, 71 F.2d 270, 272 (2d Cir.), cert. denied, 293 U.S. 601, 55 S.Ct. 117, 79 L.Ed. 693 (1934). Nevertheless, he found no false oath in the petition since no criminal intent had been established.

On EFA's appeal Chief Judge Clarie reversed, finding that Cadarette had both intentionally falsified the answers in his petition in bankruptcy and had intentionally shielded his assets from his creditors.

### THE LAW

This Circuit has consistently applied the clearly erroneous standard in reviewing findings of fact in bankruptcy proceedings dealing with precisely the same questions involved here. *In re Tabibian*, 289 F.2d 793 (2d Cir. 1961) (did the bankrupt transfer his automobile to defraud his creditors and file false oaths on his schedule); *In re Steinberg*, 143 F.2d 942 (2d Cir. 1944) (false oath in bankruptcy schedule); *Morris Plan Industrial Bank v. Henderson*, 131 F.2d 975 (2d Cir. 1942) (transfer of automobile to conceal the asset).[3] Although an appellate court is normally reluctant to overturn a bankruptcy judge's findings based largely on his assessment of the credibility of the witnesses, e.g., *Morris Plan Industrial Bank v. Henderson, supra*, 131 F.2d at 977, those findings are not entirely sheltered from appellate scrutiny. 2A Colliers on Bankruptcy ¶ 39.28 at 1539 n.22. In numerous cases where the credibility of witnesses was in issue courts have reversed a bankruptcy judge's findings of fact while applying the clearly erroneous standard. E.g., *Knetzer v. Larkin*, 178 F.2d 532 (2d Cir. 1949); *Matter of Gsand*, 153 F.2d 1001 (3d Cir. 1946); *Schapiro v. Tweedie Footwear Corp.*, 131 F.2d 876 (3d Cir. 1942); *Matter of Mason*, 49 F.Supp. 781 (E.D. Wash.1943); *Matter of Gotfried*, 45 F.Supp. 939 (S.D.Cal.1942). Since EFA established its *prima facie* case of a 14(c) violation, the burden of establishing that he has not committed any act which would prevent his discharge fell upon the bankrupt. *In re Tabibian, supra*, 289 F.2d at 795. The issue then is whether, upon reviewing the entire

---

**1.** The court shall grant the discharge unless satisfied that the bankrupt has (1) committed an offense punishable by imprisonment as provided under section 152 of Title 18; or . . . (4) at any time subsequent to the first day of the twelve months immediately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property with intent to hinder, delay, or defraud his creditors. . . .

**2.** Section 14(c)(1) set forth in note 1, cross references to 18 U.S.C. § 152 which provides in pertinent part:

Whoever knowingly and fraudulently makes a false oath or account in or in relation to any bankruptcy proceeding . . .. Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**3.** In *In re Tabibian, supra*, 289 F.2d at 795, we expressly rejected the proposition, accepted by some other circuits, e.g., *Costello v. Fazio*, 256 F.2d 903 (9th Cir. 1958); *In re Pioch*, 235 F.2d 903 (3d Cir. 1956), that findings by the bankruptcy judge of "ultimate facts" should be reviewed more closely by both the district court and the court of appeals.

record, we are left with the definite belief that the bankruptcy judge clearly erred in concluding that the bankrupt had sustained the burden of establishing that he had not defrauded his creditors and intentionally falsified his initial petition for discharge. See *In re Davis*, 404 F.2d 312, 313–14 (2d Cir. 1968).

In the instant case the bankruptcy judge found that the transfer of the Monte Carlo automobile by Cadarette to his fiancee was innocent primarily because the bankrupt considered the car to be not his own but a family vehicle "owned" by his mother. However, the Monte Carlo was registered in Cadarette's name; indeed, the very purpose of so registering the vehicle, according to the testimony of the bankrupt, was to enable him to obtain à personal line of credit. Thus, when he transferred the registration to his fiancee on July 1 we find it impossible to believe that he did not realize legal title was vested in him. The numerous other inconsistencies surrounding Cadarette's version of this gift fortify us in the conviction that the bankrupt believed the Monte Carlo to be his and was attempting to salvage this asset from his creditors.

The bankruptcy judge held that Cardarette did not transfer title to the car to his fiancee to defraud his creditors. Rather, because of the deteriorating family business his mother was concerned about her ability to make tax and insurance payments on the vehicle. But this explanation contains a troubling incongruity. It is unclear why one facing dire financial straits would choose to make a gift of a valuable and highly marketable automobile, the sale of which would certainly have helped to alleviate those financial pressures. Moreover, as the district court found, eight days after the transfer of the car a service charge of $399 was paid not by the new owner but by Cadarette with a company check. On July 27, almost a month after the transfer, the bankrupt's mother paid a personal property tax of $181.68 which included an assessment on the Monte Carlo. Both these payments, of course, seriously undermine Cadarette's claim that the transfer was effected to ease the financial burdens imposed by ownership of the vehicle.

In addition, on July 1—the very day he gave away the Monte Carlo—the bankrupt withdrew $500 from the printing company's anemic account and divided the money with his mother to finance a vacation. Also on that date he wrote a company check for $240 to his fiancee, purportedly to reimburse her for clothing she had bought for him. Thus, Cadarette simultaneously increased his mother's financial difficulties by drawing money from a family business on the brink of collapse, and made a gift of an asset which, if sold, could have funded the vacation, paid for his clothing, or defrayed more pressing expenses. In our view this confluence of events is comprehensible only if an intent to defraud his creditors is attributed to Cadarette.

Even more telling is the fact that Cadarette's fiancee lives only two houses away from the bankrupt. The uncontroverted testimony before the bankruptcy judge showed that subsequent to the transfer Cadarette retained a key to the Monte Carlo and continued to use the car to the same extent he had previously. In fact it was still parked in his backyard. The retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer. See *Matter of Vecchione*, 407 F.Supp. 609, 618 & n.6 (E.D.N.Y. 1976). See also H. Remington, 7 Remington on Bankruptcy § 3073 at 156–57 (6th ed. 1955). Similarly, the boat and trailer, items in which Cadarette's fiancee conceded she had no interest, remained on the bankrupt's property. Cadarette admitted that his mother had not requested that he dispose of the boat and trailer but testified that he gave them to his fiancee anyway to spare his mother the tax burden of continued ownership. The value of this property was so modest, however, that any resultant tax savings could only have been insignificant.

The chronology of the events in question is also important in assessing the bankrupt's intent. The printing business declined rapidly after the death of the bankrupt's father in late spring of 1977. The bankrupt

had several conferences with his principal creditor, EFA, the last of which was held the day before he transferred the Monte Carlo to his fiancee. During the month preceding the transfer Cadarette discussed his financial problems not only with EFA but also with his own accountant. Yet the bankruptcy judge found that Cadarette had no recollection of co-signing the printing equipment security agreements and that he was unaware of personal liability under these agreements until he discussed the matter with his attorney a few days prior to the filing of the petition. Especially in light of all the other circumstances recounted above, we find it incredible that despite conferences with his accountant and with EFA, where bankruptcy was admittedly discussed, Cadarette was not aware of his personal liability to EFA until immediately before he filed for bankruptcy.

Indeed, after the hearing the bankruptcy judge characterized Cadarette's tale as "bizarre and incredible"; nonetheless, he found the bankrupt's testimony "forthright" and "consistent." The record points the other way. As mentioned above, on July 20, Cadarette responded "no" to questions on the bankruptcy petition asking whether he had made a gift of or transferred any personal property within the preceding year. At the first meeting of creditors in September, 1977, when questioned by the trustee as to whether he owned a vehicle, Cadarette answered an unqualified "no." When asked how he got from place to place, he answered "I use my mother's car." In the hearing before the bankruptcy judge he explained his testimony by stating that he was referring to his mother's Chevrolet Impala. In fact, however, his mother used the Impala every day to go to work. Cadarette admitted at the hearing that he most frequently used the Monte Carlo, not the Impala. Thus, Cadarette's response at the creditors meeting was not forthright but misleading and his testimony at the hearing only highlighted the falsity of his earlier statement.

When an EFA representative visited the printing plant on September 28, 1977 to supervise the removal of equipment in which EFA had a security interest, he inquired concerning the whereabouts of the Monte Carlo. Cardarette responded that he had *sold* the vehicle because he could not afford its upkeep. Certainly Cadarette knew he had not sold the car but had given it away only two months before and that he still used it as he had previously. Moreover, as we have pointed out, the evidence that his mother and the company continued to maintain the car belied the reason proffered to the EFA representative to account for the transaction.

█ The bankruptcy judge further emphasized in his opinion that Cadarette eventually amended his petition to reveal the transfer of the automobile. We have held that in determining the bankrupt's state of mind, the trier of fact is entitled to consider a later disclosure as some evidence of innocent intent. *In re Tabibian, supra,* 289 F.2d at 796. However, as the district court found, the correct information was forthcoming only after the EFA's counsel had questioned Cadarette's fiancee and learned that there was no consideration for the transfer of the vehicle. In such circumstances the amendment of the schedule can hardly be viewed as a voluntary correction.

The bankruptcy judge also noted that Cadarette had not hidden or concealed the Monte Carlo but continued to park it in his backyard and to use it openly for business and personal purposes. However, section 14(c)(4) clearly provides liability if the bankrupt has either transferred *or* concealed any of his property. There is no doubt but that Cadarette did transfer his property.

In sum, while recognizing the narrow scope of review here, we are convinced after reading the entire record that the bankruptcy judge clearly erred in finding that the bankrupt transferred the Monte Carlo and provided answers to the pertinent questions on the schedule without an intent to defraud his creditors.

Accordingly, the decision of the district court is affirmed.