**In re R. Gene GREENWALT, Debtor.**

**UNITED BANK OF DENVER NATIONAL ASSOCIATION, Plaintiff,**

**v.**

**R. Gene GREENWALT, Defendant.**

**Adv. No. 84 C 434.**

**Bankruptcy No. 83 B 04365 G.**

United States District Court,
D. Colorado.

March 29, 1985.

Paül G. Hyman, Jr., of Holme Roberts & Owen, Denver, Colo., for plaintiff.

James H. Hahn, Steven L. Zimmerman of Zimmerman & Schwartz, P.C., Denver, Colo., for defendant.

## FINDINGS, CONCLUSIONS AND ORDER ON COMPLAINT OBJECTING TO DISCHARGE

PATRICIA ANN CLARK, Bankruptcy Judge.

The matter before the Court is the complaint of United Bank of Denver (Bank), requesting that the debtor be denied a discharge. The Bank contends that Gene Greenwalt's debts should not be discharged pursuant to Sections 523(a)(4), 727(a)(2), (3), (4) and (5) (11 U.S.C. §§ 523 and 727). A trial was held on February 8, 1985 at which a stipulation of certain facts, some testimony, numerous depositions, and voluminous bank records were entered into evidence.

The facts are as follows. The debtor, Gene Greenwalt, is the founder and former president and manager of Airwest Corporation. Airwest was established approximately 15 years ago and it has been primarily engaged in the business of providing helicopter related services. In 1980 Airwest underwent a period of extensive expansion aided with financing provided by the United Bank of Denver. However, the slump in the oil industry in 1981 proved to have devastating consequences on the financial health of Airwest. On December 20, 1982, Airwest filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. The debtor resigned as president of Airwest on September 15, 1983 and the Airwest bankruptcy was converted to a Chapter 7 proceeding on December 12, 1983.

Mr. Greenwalt's personal finances were closely tied to those of Airwest since he was a guarantor of Airwest's indebtedness to United Bank. Additionally, Gene Greenwalt and his wife Susan were the sole owners of Airwest, and it was an important source of their income. On September 26, 1983, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Gene Greenwalt. His answer, filed on October 17, 1983, stated that he had no objection to the entry of an order for relief. Accordingly, an order for relief was entered under Chapter 7 on November 1, 1983. Subsequently, Susan Greenwalt filed for relief under Chapter 7 on her own behalf.

The debtor engaged in a myriad of personal transactions in and around the time the involuntary petition against him was filed. It is not necessary, for the purposes of this opinion, to trace every one of these transactions since certain distinctive patterns developed. Instead, several of the more illustrative transactions will be examined in order to determine whether the debtor's actions preclude his receiving a discharge.

A debtor is entitled to a discharge unless the court is satisfied that the debtor has committed one of the acts listed in Section 727 (11 U.S.C. § 727). The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. 4 *Collier on Bankruptcy*, ¶ 727.01A (15th ed. 1985); *In re Decker*, 595 F.2d 185 (3rd Cir.1979). However, while the law generally favors discharges in bankruptcy, the Code should be construed to protect the debtor only in those cases where there is no intent to violate its provisions. *In re Garman*, 625 F.2d 755 (7th Cir.1980), *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir.1971).

Section 727(a)(2) provides that the court shall not grant the debtor a discharge where:

[T]he debtor, with intent to hinder, delay, or defraud a creditor or an officer of the

estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; ....

11 U.S.C. § 727(a)(2).

This provision has been distilled down to four elements, consequently in order to sustain an objection under Section 727(a)(2), the proof must show all of the following:

(1) That the act complained of was done at a time subsequent to one year before the date of the filing of the petition;

(2) With intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

(3) That the act was that of the debtor or his duly authorized agent;

(4) That the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

4 *Collier on Bankruptcy*, ¶ 727.02(b) (15th ed. 1985). *See In re Hooper*, 39 B.R. 324 (Bankr.N.D.Ohio 1984).

The first series of transactions that will be considered arose out of a $50,000 deposit made by the debtor into a Brandy Enterprises bank account. The deposit (made into Account No. 60–00854 at the Monroe Industrial Bank) occurred on September 26, 1983, the date the involuntary petition was filed against the debtor. The debtor asserts that these funds were derived from a $34,000 lease payment made to the Greenwalts by Airwest in early September, 1983, (for the use of the Lycoming engine) plus $16,000 from other proceeds. Since the debtor's bank records indicate that the debtor closed several bank accounts and made a flurry of withdrawals from other accounts on the petition date, these funds appear to be the source of the remaining $16,000.

Brandy Enterprises purports to be a partnership created by the debtor for the benefit of Brad and Roberta Jones, the debtor's stepchildren. The debtor operates as the manager of Brandy Enterprises apparently wielding total control over all of Brandy's affairs. The Stipulation of Facts reveals that Brad and Roberta Jones had no prior knowledge of the amount of the deposits made into the Brandy bank account, the amount paid out of the Brandy account, or to whom checks were paid. In fact, Brad Jones had never written a check on the Brandy bank account; Roberta Jones regularly signed the checks in blank and gave them to either Gene or Susan Greenwalt.

The evidence introduced clearly satisfies the first, third, and fourth elements required by Section 727(a)(2), however, the second element, proving debtor's intent, requires closer scrutiny. The first element is a hybrid of Section 727(a)(2)(A) and (B), it requires that the transfer occurred "at a time subsequent to one year before the date of the filing of the petition." 4 *Collier on Bankruptcy* ¶ 727.02(b). Simply put, this element is satisfied by any transfer that took place subsequent to September 26, 1982. Since this transfer to Brandy occurred on September 26, 1983, it took place within the specified time frame.

The third element requires that the act complained of was that of the debtor or his duly authorized agent. The debtor stated during the first meeting of creditors that he paid $50,000, out of his personal funds, into the Brandy bank account. This statement also serves to satisfy the fourth element which requires that the act amounted to a transfer or removal of the debtor's property (although Susan Greenwalt may have a one-half interest in it also). Therefore, the only remaining pre-requisite to a denial of discharge is element number two, which requires that the transfer was made with the intent to hinder, delay or defraud.

■ The intent element can be supplied by a presumption arising out of the debtor's act. "The fact that valuable property

has been gratuitously transferred raises a presumption that such a transfer was accompanied by the actual fraudulent intent necessary to bar a discharge." *In re Bateman*, 646 F.2d 1220, 1223 (8th Cir.1981); *In re Gordley*, 38 B.R. 630 (Bankr.S.D.Ohio 1984). Further, upon a showing that there are reasonable grounds for believing that the debtor acted in the manner alleged, the burden of proving that he has not committed any such acts shall shift to the debtor. *Shainman v. Shear's of Affton, Inc.*, 387 F.2d 33 (8th Cir.1967). Here the fact that the debtor gratuitously transferred $50,000 to Brandy is sufficient to raise the presumption of fraudulent intent. The debtor did not effectively refute this presumption with evidence that Brandy paid any consideration. The debtor stated at a deposition that the $50,000 represented a loan which was supported by a note signed by the stepchildren. No such note was ever produced, nor was this transaction listed in the debtor's schedules.

The debtor knew, or should have known, that his personal bankruptcy was imminent even before the involuntary petition was filed against him on September 26. He testified that when he resigned from Airwest on September 15, he felt that the company would not be able to survive. Since United Bank was substantially under secured, and Gene Greenwalt was personally liable for Airwest's loans, the debtor must have been aware that his own bankruptcy would soon ensue, whether voluntarily or involuntarily. Examined in light of the surrounding circumstances, it is apparent that the debtor made the $50,000 gratuitous transfer to Brandy with the intent to protect it from his creditors. Since the debtor knew that these funds would otherwise become property of the estate, his conduct evinces an intent to defraud his creditors.

Furthermore, on October 31, 1983, $15,000 was withdrawn from the Brandy bank account by Susan Greenwalt. Another $10,000 was withdrawn by Susan Greenwalt on November 14, 1983. The Greenwalts admit that they used this $25,000 for their personal living expenses and that

Brad and Wendy Jones had no prior knowledge of these withdrawals. The fact that Gene Greenwalt gratuitously deposited $50,000 into the Brandy bank account, did not disclose this transfer in his schedules, and utilized one-half of these funds for his personal expenses only serves to buttress this Court's conclusion that the deposit was made with the intent to defraud his creditors. Thus, all the elements necessary to sustain the objection to discharge are present.

Another series of transactions that warrants close judicial scrutiny pertains to the Monroe Industrial Bank Certificate of Deposit. In September of 1982, the Greenwalts acquired a $100,000 certificate of deposit. Bank records reflect that on September 26, 1983, the day the involuntary petition was filed, the certificate of deposit was converted into a check for $40,000 and a $60,000 certificate of deposit.

The evidence shows that soon thereafter Susan Greenwalt borrowed $50,000 in cash on the $60,000 certificate of deposit and carried the cash home. Then, on October 11, this money was loaned to Transavia. Transavia was a new company, incorporated only a few days earlier by former employees of Airwest. The debtor was thereafter hired by Transavia to manage its fixed base operation.

As previously set forth, there are four elements which must be established for a discharge to be denied under Section 727(a)(2). As before, only the intent element is not established on the face of the facts. First, the loan meets the timeliness requirements of Section 727(a)(2) since it occurred subsequent to one year before the filing date (or in other words, after September 26, 1982). This element was established by the testimony of Dean Taylor, the president of Transavia, Inc., who indicated that the loan took place on October 11, 1983. Second, the loan to Transavia may be imputed as an act of the debtor since it was made jointly by Gene and Susan Greenwalt. Although Susan Greenwalt borrowed the $50,000 against the certifi-

cate of deposit, Gene Greenwalt admitted in a deposition that the loan was made by both the Greenwalts. Gene and Susan Greenwalt are also both named as beneficiaries of the note. Third, a $50,000 loan constitutes a transfer or removal of property of the debtor's estate, even though Susan Greenwalt may have a right to one-half. Thus, the intent to hinder, delay or defraud is the only element remaining to be proven.

Since intent is rarely susceptible to direct proof, it may be inferred from the actions of the debtor.. *Future Time, Inc. v. Yates,* 26 B.R. 1006 (M.D.Ga.1983); *See also Matter of Reed,* 700 F.2d 986 (5th Cir.1983). Here the debtor's actions, examined in light of the circumstances surrounding the loan transaction, leave little doubt that the intent to hinder, delay or defraud creditors was present from the inception of this deal. The debtor's schedules and his testimony in depositions reflect his knowledge that his debts far exceeded his assets. Surely the debtor was aware that the $50,000 in cash would be readily distributed among his creditors through the Chapter 7 case. Yet, with this in mind, he converted liquid assets into a five-year note, causing both a hindrance and delay to his creditors, who must now either wait five years or sell the note at a discount.

It should be noted that Section 303(f) allows the debtor to continue to make transfers in the ordinary course of business between the filing of an involuntary petition and the order for relief. *In re American Gypsum Co.,* 36 B.R. 360 (Bankr.D.N.M.1984). "During the 'gap period' the debtor may make transfers for contemporaneous consideration, including services. Payment may be made for essential services and professional services including retention of counsel as required by the debtor during the 'gap.'" 2 *Collier on Bankruptcy,* ¶ 303.35 (15th ed. 1985). However, the debtor may not abscond with assets or dispose of them in some manner detrimental to the debtor's creditors. H.R. No. 95–595, 95th Cong., 1st Sess. 323 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 33 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787.

The loan to Transavia is outside the ambit of transfers made in the ordinary course of business because the debtor was not in the business of providing financing to fledgling companies. A debtor who, after an involuntary petition has been filed against him, sinks substantial assets into an infant company of which he is neither an officer or director belies a wanton disregard for the interests of his creditors. The Court may only speculate that the debtor's primary motivation in making the loan was to provide himself a job (Gene Greenwalt commenced working for Transavia a couple of weeks after the loan transaction) or to create a business to lease several helicopters that he owned and operated under the name of Flight 70. Regardless, this entire pattern of conduct evinces an intent to hinder and delay the creditors from receiving the $50,000 in cash. Consequently, the Court finds that all the elements required to deny a discharge under Section 727(a)(2) have also been met on these facts.

Another illustration of the debtor's disregard for applicable Bankruptcy Code provisions is exhibited by his use of the sale proceeds from a Ford two-ton truck. Based solely upon the debtor's own admissions and the stipulated facts, the debtor could be denied a discharge pursuant to Section 727(a)(2) because of his use of such funds.

On May 6, 1983 Airwest sold a Ford truck to Orion Helicopters, Inc./Paul Bennett (Orion) for $9,100. Orion paid three installments over the next several months totaling $2,100. On September 15, 1983, Orion paid to the debtor directly $10,000 which represented the remaining $7,000 due on the truck and $3,000 owed to the debtor personally in connection with the sale of a helicopter. The debtor indicated in his schedules and Statement of Financial Affairs that he was holding the aforementioned $7,000 (the schedules listed it as "approximately $6,000") for Airwest. Yet, the Stipulation of Facts reveals the debtor

spent $7,000, derived from the sale of the truck, on personal expenses some time after the order for relief was issued. The explanation proffered by the debtor was that the funds constituted an offset for salary that Airwest had not paid to him and Susan Greenwalt.

If the debtor's offset claim is valid, and the debtor rightfully availed himself of self-help, then spending the $7,000 after the order for relief was entered constitutes conduct which justifies a denial of discharge under Section 727(a)(2). Clearly the $7,000 became property of the debtor's estate once the order for relief was entered and the order for relief so notified the debtor. Therefore, this expenditure reflects an intent to defraud the trustee, who is charged with custody of the property of the estate pursuant to Section 542 (11 U.S.C. § 542). Of course, it also defrauds the creditors because they ultimately are entitled to the proceeds of the estate.

On the other hand, if the $7,000 was wrongfully appropriated from Airwest, the debtor may well be denied a discharge pursuant to Sections 727(a)(7) and 727(a)(2). The former provides that the debtor may be denied a discharge if "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of the subsection, on or within one year before the date of the filing of the petition; or during the case, in connection with another case ... concerning an insider." 11 U.S.C. § 727(a)(7). Since the debtor was an insider in connection with Airwest, a debtor in another bankruptcy case, the knowing misappropriation of Airwest funds would constitute grounds for denying the debtor a discharge under Section 727(a)(2) read in conjunction with Section 727(a)(7).

█ Despite whatever sympathy the debtor's misguided efforts to insulate certain assets from his creditors so he could sustain himself may arouse, the law appears quite clear. Each of three transfers chronicled above are independent grounds for denying the debtor a discharge. Because of this conclusion it is not necessary to discuss the additional conduct of the debtor that the Bank alleges gives rise to a denial of discharge. Therefore, for the foregoing reasons, it is

ORDERED that a discharge shall not be granted to R. Gene Greenwalt.

FURTHER ORDERED that the parties shall have 10 days from the date this Order becomes final to file a written request for the withdrawal of all exhibits received in evidence, after which time the exhibits will be destroyed by the Clerk without further order of the Court.