**In re Susan W. GREENWALT et al., Debtor.**

**UNITED BANK OF DENVER, Plaintiff,**

**v.**

**Susan W. GREENWALT, Defendant.**

**GATX THIRD AIRCRAFT CORP., Plaintiff,**

**v.**

**Susan W. GREENWALT, Defendant.**

**Bankruptcy No. 84 B 3974 G. Adv. Nos. 85 G 0065, 85 G 0077.**

United States Bankruptcy Court, D. Colorado.

July 31, 1986.

**556**

Richard Clark, Fort Collins, Colo., for Susan W. Greenwalt, debtor.

Susan K. Morath, Davis, Graham & Stubbs, Denver, Colo., for GATX Third Aircraft Corp., plaintiff.

Paul G. Hyman, Jr., Holme Roberts & Owen, Denver, Colo., for United Bank of Denver, plaintiff.

## MEMORANDUM OPINION AND ORDER

CHARLES E. MATHESON, Bankruptcy Judge.

This matter came on for trial before the Court on the complaints filed herein by the United Bank of Denver ("Bank") and GATX Third Aircraft Corp. ("GATX") objecting to the Debtor's discharge herein pursuant to the provisions of 11 U.S.C. § 523 and § 727. This matter is a core proceeding pursuant to and within the meaning of 28 U.S.C., Sections 157(b)(2)(I) and (b)(2)(J).

This tawdry tale of casual disregard of the provisions of the Bankruptcy Code and of the interests of third parties has already been told in the case of *In re Greenwalt*, 48 B.R. 804 (Bankr., Colo.1985) wherein a discharge was denied in the proceedings concerning Gene Greenwalt, this Debtor's husband. The tale does not improve by a second telling nor does the result differ.

The Debtor's financial fortunes were linked to Airwest Corporation ("Airwest"), a business which was owned by this Debtor and her husband. Airwest was engaged in the business of providing charter helicopter service, particularly to the oil and gas industry. In addition, Airwest supplemented its income by purchasing and rebuilding wrecked aircraft and helicopters. Funding for its enterprises was carried on, in large part, through loans from the Bank. Due to the oil slump and cutbacks in drilling activities, the fortunes of Airwest declined and led it to file a voluntary petition under Chapter 11 of the Bankruptcy Code on December 20, 1982.

The Airwest proceeding was bitterly contested by various creditors including the Bank. There were a series of cash collateral hearings and cash collateral orders culminating in a hearing on September 7, 1983. At that time counsel for Airwest advised the Bank that Airwest was, in essence, capitulating, and that Mr. Greenwalt would resign as an officer of Airwest. That conversation between counsel for Airwest and the Bank was held in the absence of Mr. Greenwalt, but the facts indicated that on that date Mr. Greenwalt had confirmed to counsel for Airwest that he would tender his resignation. In fact, the resignations were tendered for both Mr. Greenwalt and Mrs. Greenwalt effective September 15, 1983.

At the time the Airwest Chapter 11 was filed, the Debtor was attending college at Colorado State University majoring in accounting. She left school and returned to Airwest to work as office manager overseeing the administrative office matters of the company. Due in part to the cash collateral orders in place, it was necessary for Airwest to maintain strict control over available cash. In addition, each Monday, Airwest provided a sources and uses of funds statement to the Bank, which, among other things, accounted for all cash and cash disbursements. On Saturday, September 10, 1983, after Mr. Greenwalt had agreed verbally over the telephone to resign as an officer of Airwest, the Debtor went to the office of Airwest where she wrote four checks, one in the amount of $30,003, one for $34,365, and two in the sum of $4,903 each, all made payable to the First Interstate Bank. She then called the bookkeeper for Airwest to inquire whether he had completed his cash report for the

week and whether the issuance of checks on that Saturday would require him to amend his report. He confirmed both that such checks would have to be included and that his report would have to be amended. According to his testimony that was the totality of the conversation, while the Debtor insists that she told the accountant what she had done and that she would amend the situation so that the report would not have to be clarified. Whichever story is correct, the fact remains that when the accountant arrived at the office on Monday morning, he found that two pages of the general ledger had been removed and had been rewritten by the Debtor. In doing so, it was falsely stated that the checks had not been issued until the following Monday, September 12, 1983, thereby avoiding the necessity of including the issuance of those checks in the prior week's report. By this expedient the Greenwalts were able to avoid having the Bank learn about the issuance of the checks until after Mr. Greenwalt's formal resignation. The accountant testified that, after that weekend, the Debtor was never seen at Airwest again.

During the course of the Chapter 11, the Greenwalts had, from time to time, loaned money to Airwest. The monies that the Debtor removed by writing the checks were ultimately credited against the loans from the Greenwalts. The checks were used by the Debtor to draw cashiers' checks and the funds were then deposited in accounts in the name of Mr. and Mrs. Greenwalt or in accounts for which they were both authorized signatories. It is significant to the Court that the Debtor drew the checks payable to First Interstate, from which she then obtained cashiers' checks, as opposed to issuing the checks to the Greenwalts in the first instance.

Mr. Greenwalt had personally guaranteed the attorneys' fees which were accruing for Airwest. Because of the limitations on the use of cash collateral and the security interest of the Bank, Airwest did not have the funds to pay those attorneys' fees. Out of the monies removed from the company by the checks written by the Debtor, $20,000 was utilized to pay the attorneys' fees for the attorneys for Airwest.

On September 15, 1983, Mr. Greenwalt's resignation from Airwest became effective. On September 26, 1983, he instructed the Debtor to withdraw all of their cash from all of their various checking accounts. This was done because of the recognition that GATX had a judgment outstanding on which it was issuing writs of garnishment, and there was a fear that the Bank might also take steps to seize funds which might be available to it. In addition to withdrawing the cash that was in the accounts steps were also taken to reduce the balance on an outstanding certificate of deposit and to borrow against that certificate of deposit, thereby generating significant cash funds in the Greenwalts' hands. On September 27, 1983, an involuntary petition was filed against Mr. Greenwalt.

Following the filing of Mr. Greenwalt's involuntary petition, he thereafter sold two automobiles which he and the Debtor owned jointly. The monies from the sale of those automobiles were not received until after his involuntary case was filed. Those funds were collected and used by the Greenwalts and not turned over to the trustee for Mr. Greenwalt's Chapter 7 case, nor did the Greenwalts account for the use of those funds. In addition, prior to his leaving Airwest, Mr. Greenwalt had arranged the sale of a truck. He later collected $7,000.00, representing the final portion of the purchase price for the truck, which he retained and the Greenwalts used for personal living expenses. His justification for doing so was that he was owed back salary by Airwest.

Sometime in approximately early 1983, the Greenwalts formed a partnership for their children referred to as "Brandy." There are no partnership documents to establish when the partnership was organized or the terms of the partnerhip, nor were any partnership tax returns ever filed. The Greenwalts purchased a wrecked helicopter, which they titled in the name of Brandy and which was later rebuilt by Air-

west. On September 26, 1983, the Greenwalts used their personal funds drawn out of their joint banking accounts and put $50,000.00 cash in Brandy. The Debtor's testimony was that this was done because the helicopter owned by Brandy was about to become operational, and the dollars would be needed for fuel and operating expenses. However, the testimony also was clear that Brandy never operated the helicopters, did not have any pilots or any contracts, and only leased the helicopter out to Airwest which had full operational control.

Checks on the Brandy bank accounts were signed in blank by the Debtor's daughter. With those checks in hand, on September 27, 1983, the Debtor withdrew $15,000.00 from the Brandy account, $10,-000.00 of which she deposited to Mr. Greenwalt's account and $5,000.00 of which she retained in cash. Later, on November 30, 1983, an additional $10,000.00 was withdrawn from the Brandy account and deposited to the Debtor's account. The Debtor's daughter testified that she had signed all the checks in blank, was never advised when the checks were utilized, and was never informed about what was going on with Brandy.

A group of former employees of Airwest formed Transavia Corp. which was organized to carry on essentially the same type of business. Since Mr. Greenwalt had resigned from Airwest, he was out of a job and desirous of finding a source of income. Transavia, on the other hand, was in need of working capital. Mr. Greenwalt agreed to loan Transavia $50,000.00. A representative from Transavia picked up the money in Mr. Greenwalt's home—$50,000.00 in $100 bills stuffed in a paper sack out of the cash removed by the Debtor from the Greenwalts' bank accounts. Transavia gave its note to the Debtors' payable, interest only, at prime plus two and due in 1989. No security was given for the note. Transavia then hired Mr. Greenwalt to serve as manager of its fixed based operations. Since the oil and gas business has not prospered, Transavia itself is not doing well, and the note is now in default.

In addition to the aircraft owned by Airwest, Mr. and Mrs. Greenwalt owned some helicopters in their own name which were leased to Airwest. They maintained a bank account in the name of "Flight 70" to account for the aircraft and the expenses and income, incident thereto. The Debtor testified that this was purely a bookkeeping device, and so it remained until September 27, 1983, the day the involuntary petition was filed against Mr. Greenwalt. On that day, he took steps to incorporate Flight 70 and to transfer the aircraft owned by Mr. and Mrs. Greenwalt into the newly formed corporation.

The Debtor owned an interest in a promissory note representing part of an inheritance. She sold her interest in the note on June 14, 1984, to her mother-in-law. For that the Debtor received a series of checks. She was unable to account for the use of these dollars. She had available a summary from her memory of what the dollars had been used for, but could provide no backup information by way of cancelled checks or receipts. She testified that approximately $15,000.00 had been used to pay for travel expenses, which had been paid in cash by Mr. Greenwalt. However, she did not have available any receipts of any kind.

The Debtor's voluntary bankruptcy petition was filed on August 17, 1984. Thereafter, on September 4, 1984, she utilized the last of the funds received from her mother-in-law to make a payment to First Interstate Real Estate Services, a separate creditor.

■ One of the primary purposes of the Bankruptcy law is to "relieve the honest debtor from the pressure and discouragement of pre-existing debt and to give him a new opportunity in life and a clear field for future effort." *Personal Finance Co. of Colorado v. Day*, 126 F.2d 281 (10th Cir. 1942). The emphasis is on the word "honest" debtor, and the provisions of the Bankruptcy Code granting discharge should be applied only to protect debtors who have

not abused the process. *In re Greenwalt*, 48 B.R. 804 (Bankr., Colo.1985).

Section 727 of the Bankruptcy Code deals with discharge. It specifies that the Court shall grant the debtor a discharge unless

(a)(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

The facts stated above leave no doubt as to the existence of the various objective facts specified under Secton 727(a)(2). The time frame dates from one year prior to the filing of this Debtor's petition. During that period of time, there were a number of transfers of property in which this Debtor had an interest. There was cash transferred to Brandy, cash transferred to Transavia, and property transferred to the newly formed Flight 70, all which occurred within the one year period and in which this debtor had an ownership. There was also cash, which was property of the estate, utilized by this Debtor after the filing of her petition. Those facts were established and cannot be controverted. The subjective finding of whether such transfers were made with intent to "hinder, delay, or defraud a creditor or an officer of the estate" is not as clearly defined.

A debtor seldom proclaims, at or after the time of making a transfer, that it was his firm intent to do so for the purpose of delaying, hindering or defrauding a creditor. To be sure, virtually every transfer, regardless of the good motives, may have the effect of hindering or delaying creditors in the collection of debts owed them, and all transfers are not proscribed by Section 727.

■ Fraudulent intent may be established, and usually must be, by circumstantial evidence or by inferences drawn from a course of conduct. Subsequent conduct, itself, is often probative of a debtor's intent on a prior occasion. *In re Farmers Cooperative Assoc. of Talmage, Kansas v. Strunk*, 671 F.2d 391 (10th Cir.1982); *In re Bernson*, 15 B.R. 100 (Bankr.Fla.1981); *In re Future Time, Inc. v. Yates*, 26 B.R. 1006 (D.C.Ga.1983). Where valuable property has been gratuitously transferred to another, a presumption is raised that such transfer was accompanied by actual fraudulent intent sufficient to deny discharge. Specific instances of the required intent have been found by courts where the debtor has shifted assets to a corporation owned by the debtor, continued to retain possession, benefit and use of the property, and treated the property as the debtor's own. *In re Kaiser*, 722 F.2d 1574 (2nd Cir.1983); *In re Cadarette*, 601 F.2d 648 (2nd Cir.1979). Transfers to family members with little or no consideration have also been held to be fraudulent transfers and evidence the required intent. *In re Greenwalt*, supra., *In re Matter of Emmett*, 16 B.R. 656 (Bankr.Fla.1981). As to other examples, see *In re Collins*, 19 B.R. 874 (Bankr.Fla.1982); *In re Nazarian*, 18 B.R. 143 (Bankr.Md.1983); *In re Martinez*, 31 B.R. 299 (Bankr.Vt.1983); *In re Zouhar*, 10 B.R. 154 (Bankr.N.M.1981).

■ The facts surrounding the transactions engaged in by the Debtor in the instant case leave no doubt that this Debtor, together with her husband, was acting knowingly and intentionally to divert funds and assets and to hinder and delay her creditors. The transfer of $50,000.00 to Brandy ostensibly for operational funds for a non-operating company, taking checks signed in blank by her daughter, which checks were utilized to withdraw substantially all of the $50,000.00 within a month after the original transfer, strongly indicates that the funds were placed in Brandy in the first instance simply to have available a pool of cash which the Debtor and her husband could draw on for their own

uses, which could not be quickly garnisheed or attached by creditors.

The withdrawal of cash from all banking accounts on the same day that the involuntary petition was filed against Mr. Greenwalt is further evidence of the fraudulent intent that permeated the transactions engaged in by this Debtor. The Debtor was a businesswoman. She was working as the office manager for Airwest. She was in the midst of her education as an accountant. She was not an unsophisticated, unknowing dupe. The transaction with Transavia whereby $50,000.00 in $100 bills in a paper sack were delivered to an officer of Transavia as a loan is simply not consistent with good business practices. The obvious suggestion is that the cash was put in Transavia to be used to fund the "salary" for Mr. Greenwalt on an ongoing basis with little expectation that the monies would otherwise be repaid by Transavia, as evidenced by the unrealistic terms of the note and a lack of any security for the repayment. That was money in which this Debtor had an interest, as is clearly evidenced by the fact that the promissory note from Transavia is payable jointly to both Mr. and Mrs. Greenwalt. These transactions and the others discussed in the statement of facts above evidence an overt effort by this Debtor to join with her husband to transfer and conceal assets from their creditors, and this Court has no hesitancy in finding that such transfers were made with the actual intent to hinder, delay or defraud the creditors of this estate.

■ A discharge can also be denied if the Debtor has failed to keep or preserve recorded information, including books, documents, records and papers, from which the Debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case. 11 U.S.C. § 727(a)(3). If the facts of the case disclose a breach by the Debtor of the Debtor's obligations to keep or preserve proper books and records, and the Debtor fails to adequately establish facts and circumstances to justify such failure, a discharge should be denied. *In re Texas National Bank of Beaumont v. Edson,* 100 F.2d 789 (5th Cir.1939). The question in each case is the reasonableness of the particular circumstances. Complete disclosure by the Debtor is in every case a condition precedent to granting a discharge. *In re Underhill,* 82 F.2d 258 (2nd Cir.1936).

■ Dealing in large sums of cash does not lend itself to accurate record keeping. Testimony established, among other things, that Mr. Greenwalt had spent some $15,-000.00 on travel expenses out of funds given to him by this Debtor for which there were no records. No receipts were produced and apparently no contemporaneous record of expenditures of cash on business travel expenses was maintained by Mr. Greenwalt. Such records are a fundamental part of a businessman's lifestyle and are critically necessary for income tax reporting purposes. With the facts indicating that this Debtor and her husband had little hesitancy in engaging in transactions for the purposes of secreting assets, the disposition of $15,000.00 in cash without bills and receipts of any kind is contrary to the spirit of Section 727(a)(3) and would justify the denial of discharge itself.

Other grounds for denial of discharge might be raised under 11 U.S.C. § 727(a)(5) and (6), particularly in connection with the transactions engaged in by Mr. Greenwalt after the filing of the involuntary petition against him in selling assets of his estate and collecting the funds, and in the Airwest case of collecting and spending monies attributable to the sale of Airwest assets. However, it serves no purpose to lengthen this opinion unnecessarily. What has already been recited amply justifies the determination by this Court that it would be contrary to the spirit of the Bankruptcy Code to enable this Debtor to depart this court discharged of her liabilities.

The creditor, GATX, has a judgment against the Debtor entered in its favor in a Federal District Court proceeding. The status of the Bank as a creditor in this proceeding has been disputed by the Debtor.

The Bank's claim against the Debtor arises out of the Bank's loans to Airwest. There is no dispute that early in the loan arrangements the Debtor signed her personal guarantee in favor of the Bank guaranteeing the repayment of the Airwest loans. That guaranty agreement was not produced by the Bank. Instead, the Bank predicated its claim against the Debtor on a certain guaranty dated April 7, 1982. As to that guaranty agreement, the Debtor has denied that it is her signature on the agreement and, even if it is her signature, denies that the date which is written in on the agreement was written by her. She further denied being at the Bank, or in Denver, on the date that the guaranty was dated.

The Court heard the testimony of Ms. Clare Trout, a former officer of the Bank, who was the account officer for Airwest on April 7, 1982. She identified the guaranty agreement and testified that it was signed in her presence by the Debtor on April 7, 1982. Her testimony was that she could "explicitly recall" the Debtor signing the guaranty. She further testified that she did not date the guaranty, and it was her belief that it was dated by the Debtor. At the time the guaranty was taken, the loans to Airwest were in place.

The Bank also produced an expert witness, Rolland H. Osborne, to testify concerning the signatures. Mr. Osborne, whose credentials were impeccable, testified that he had examined the document and that the signature on the guaranty was, without question, the signature of the Debtor. He also testified that he was aware that the Debtor had hired an expert to examine the signature on the guaranty, and the Debtor's expert had expressed his opinion that the guaranty had been signed by the Debtor. The Debtor acknowledged that her expert had so advised her.

The Bank's expert had not been asked to examine the date on the guaranty, but on cross-examination, he was so asked. He then examined other specimens of the Debtor's handwriting and, based on his examination, testified that it was his opinion that it was more likely, as opposed to less likely, that it was the Debtor who had both signed and dated the guaranty.

As noted, the Debtor denied signing the guaranty and strongly denied dating the guaranty. She testified in particular that the "figure 8" was made directly contrary to the manner in which she ordinarily would write an eight. The Debtor's testimony has little credibility. Her testimony concerning the necessity of putting $50,-000.00 into Brandy to fund operations of a non-operational company, which monies were, in large part immediately withdrawn by the Debtor for her personal use, in and of itself tends to destroy the credibility of the Debtor's testimony. Further, it appears to the Court that the question of when the guaranty was dated, or by whom, is of little consequence. The guaranty was clearly signed by the Debtor. Further, Ms. Trout, the Bank officer, has testified unequivocally that the guaranty was signed and delivered on April 7, 1982. Thus, the guaranty was effective on that date regardless of who may have dated it.

Having heard the witnesses and examined the exhibits, there is no question in the Court's mind that this Debtor guaranteed the obligations of Airwest Corporation to the United Bank of Denver and is liable to the Bank for any deficiencies. The testimony of the Bank officer was that the total principal and interest due and unsatisfied on the note as of the date of the hearing was $6,798,308.95, for which the Bank is entitled to judgment.

IT IS THEREFORE ORDERED that a discharge shall not be granted to Susan Greenwalt, and

IT IS FURTHER ORDERED that the United Bank of Denver shall have, and there shall enter forthwith, a judgment in its favor and against Susan Greenwalt in the amount of $6,798,308.95, and

IT IS FURTHER ORDERED that the parties shall have ten days from the date this order becomes final to file a written request for the withdrawal of all exhibits received in evidence, after which time the

exhibits will be destroyed by the Clerk without further order of the Court.