**In re Walter W. JOHNSON, Debtor.**

**Oliver H. DANIEL**

v.

**Walter W. JOHNSON.**

Civ. A. No. 87–1838.
Bankruptcy No. 85–3416.

United States District Court,
E.D. Louisiana.

Nov. 10, 1987.

Bernard H. Berins, Jonathan L. Bookman, Bronfin, Heller, Steinberg & Berins, New Orleans, La., for Oliver H. Daniel.

Robert G. Stassi, Stassi & Rausch, New Orleans, La., for Walter W. Johnson.

ROBERT F. COLLINS, District Judge.

Oral arguments in the above styled case appealing the Bankruptcy Court Judge's decision to grant the debtor a discharge were heard by this Court on September 9, 1987. Appellant, Oliver H. Daniel, objected to the discharge of Walter W. Johnson, the debtor or appellee, on the basis of § 727(a)(5) of the Bankruptcy Code, which provides:

> "The Court shall grant the Debtor a discharge, unless ... (5) the Debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the Debtor's liability;"

Although the ultimate burden of proof in a proceeding objecting to discharge under § 727(a)(5) lies with the plaintiff or creditor, once the creditor has brought forward sufficient evidence to show that an explanation of the debtor's loss of assets should be required, then the burden of going forward with an explana-

tion shifts to the debtor. *In re: Ronald A. Martin*, 698 F.2d 883, 10 B.C.D. 212 (7th Cir.1983). The debtor then has the obligation to bring forth evidence to satisfactorily explain any loss or disappearance of assets. at 886–88, 10 B.C.D. at 215–16. At this point, the ultimate burden of persuasion is with the creditor to overcome a credible explanation of his affairs, if given by the debtor. *Id. See also In re: Nye*, 64 B.R. 759 (BC E.D.N.C.1986); *In re: Schermer*, 59 B.R. 924 (BC W.D.Ky.1986); *In re: Bailey*, 53 B.R. 732 (BC W.D.Ky. 1985).

"The creditor's burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss of his assets." *Matter of Reed*, 700 F.2d 986 (5th Cir.1983), 12 (citing *In re: Shapiro & Ornish*, 37 F.2d 403 (N.D.Tex. 1929), *aff'd*, 37 F.2d 407 (5th Cir.1930)).

In this case, appellant has objected to the appellee's alleged failure to explain the decline in the value of debtor's interest in (A) partnerships, (B) mortgages, (C) Stone Oil Investments, (D) personal property, (E) life insurance (vested commissions), (F) Walter W. Johnson & Associates, and (G) increase in mortgage liabilities.

A. *The Decline in the Value of Debtor's Partnership And Individual Interest in Thoroughbred Ventures From June 1, 1982 to December 6, 1985*

The majority of debtor's interest in partnerships were related to thoroughbred syndications. The sole asset of the various partnerships were one or two race horses. The partnership would initially purchase the horse and finance the boarding and training expenses. The income was derived from purse winnings. Appreciation of the asset is based upon the thoroughbred's success on the race track. In sum, with purse earnings and appreciation, expenses are offset.

In this case, a review of the Bankruptcy Court transcript shows that the value of Mr. Johnson's partnership interest in certain thoroughbred ventures declined due to a series of injuries, mishaps and losses

on the sale of various horses constituting each partnership.

The partnership, Tullamore Farms 1980 No. 2, consisted of two horses, "Beware Hare" and "High Tribune." The value of the horses were derived from appraisals conducted by outside blood-stock agents. Debtor reflected his interest in the partnership as $72,278.00 on his June 1, 1982 financial statement.

"Beware Hare" ran through a fence while training. Approximately $32,000.00 was collected in insurance proceeds. These funds were deposited to the partnership and disbursed in payment of payables.

"High Tribune" was sold in New York in a fair certificate sale for $4,740.00. These funds were deposited to the partnership and disbursement for payment of payables. The partnership was dissolved in 1984.

The partnership Tullamore Farms 1981 No. 3 consisted of two horses: "For Quack's Sake" and "Winning Tack." The value of the horses was derived from appraisals conducted by outside blood-stock agents. Debtor reflected his interest in the partnership as $94,595.00 on June 1, 1982. His interest increased to $157,500.00 as of December 22, 1982 by "Winning Tack's" successful performance on the race track in New York. Subsequently, "Winning Tack" was injured and sold in a broodmare sale in Kentucky for $140,000.00. The debtor's interest was $3,000.00 as of January, 1984.

"For Quack's Sake" was claimed in a race at Churchill Downs for $6,000.00. These funds were deposited to the partnership and disbursed in payment of payables. The partnership was dissolved.

The partnership Tullamore Farms "Executive Intent" Syndication consisted of the one horse. The value of the horse was derived by outside block blood-stock agents. The debtor valued his interest at $15,000.00 on his June 1, 1982 financial statement. His interest increased to $25,-000.00 as of December 22, 1982 by subsequent appraisal.

The horse broke three vertebrae in its neck which ended his racing career. The Syndication donated the horse to Louisiana

Tech University; no money was received by the partnership. The partnership was dissolved.

The partnership Tullamore Farms "Brazen Brothers" consisted of the one horse. This is a stallion syndication. Each share holder obtained rights to breed their mares, or sell their share to breed the stallion. The debtor initially valued his fractional interest to $25,000.00. Market conditions changed the stud fee. This fee times the number of shares and life expectancy computes the partnership value. The debtor, using this formula, which is the accepted valuation in the thoroughbred industry, calculated his interest as $7,250.00.

The J & V Partnership consisted of two horses: "Nasty Notions" and "Off Campus." Both horses sustained injuries and were removed from the racing circuit. "Nasty Notions" was sold in foal in 1985 for $3,650.00, and "Off Campus" was sold for $3,000.00. The debtor initially valued his interest in the partnership at $25,000.00 on June 1, 1982. This evaluation was based on the brood-mare formula. The proceeds of the sale of the horses were received by the partnership. These proceeds were used to take care of payables. The remainder was distributed to the partners.

The partnership Tullamore Farms 1982 No. 1 consisted of four horses: "So Command," "Run Away Native," "Cest Real" and "Exspecious." The original value of the syndication was $500,000.00. The debtor valued his interest at $36,010.00 on December 22, 1982. The value of his interest was $27,950.00 on January 1, 1984 and a — $99,660.00 on December 5, 1985, based on appraisals conducted by outside blood-stock agents.

"So Command" was donated to Louisiana Tech University. "Run Away Native" was claimed in Kentucky for $5,000.00. "Cest Real" was sold as a brood-mare for $60,000.00, and "Exspecious" is presently being handled by another trainer who is responsible for all the horse's expenses. "Exspecious" was purchased by the debtor individually before the termination of the partnership in 1985.

The combined losses as reported on the Federal Partnership Tax Returns for the periods 1982 through 1985 is $1,315,570.00.

The debtor individually purchased two horses: "She's On Top" and "Woozley" for $500,000.00 from the American European Bank in New York. This was a credit purchase with the bank holding a mortgage (jockey certificate on the horses). The debtor was unsuccessful in syndicating the horses. The horses were eventually surrendered to the bank and sold for $3,000.00. Again, each horse sustained injuries and were removed from the racing circuit.

B. *The Decline in the Value of Mortgages Owned by Debtor from $25,000.00 on June 1, 1982 to Zero on December 6, 1985*

■ The $25,000.00 was on a piece of property known as University Townhouse in Baton Rouge, Louisiana. This mortgage note was paid and cancelled. The proceeds were deposited in his personal checking account.

C. *Decline in the Value of Debtor's Interest in Stone Oil Investments from $450,000.00 on June 1, 1985 to $113,000.00 on December 6, 1985*

■ The Stone Oil Investment was a partnership interest in J & H Investments No. 1, 2 and 3, a limited partnership offered by Stone Petroleum Corporation of Lafayette, Louisiana. It was a joint venture arrangement where investors shared expenses and revenues. Stone Petroleum Corporation provided independent appraisals by geologists and consulting engineers on the evaluations of the programs. The decline in the value of the debtor's interest in Stone Oil Investments was based on appraisals provided by Stone Petroleum Corporation.

D. *The Decline in the Value of Debtor's Personal Property from $55,000.00 on June 1, 1982 to $15,400.00 on December 6, 1985*

■ The debtor's estimate of the value of personal property listed on earlier finan-

cial statements was based on his original cost; whereas, his estimate of the value of that same property for purposes of the bankruptcy petition was based on his estimate of its value at a distressed sale.

### E.1 The Decline in the Value of the Debtor's Vested Life Insurance Commissions from $151,131.00 on June 1, 1982 to Zero on December 6, 1985

■ The debtor's vested life insurance commissions comprise a remittal commission on insurance sold by debtor, kept in force by purchaser year after year. In 1980, debtor incorporated his insurance business to Walter W. Johnson & Associates, Inc. The commissions were then paid directly to his corporation by State Mutual Insurance Company, although technically vested commissions earned prior to 1980 were individual commissions, State Mutual elected to issue only one check payable to Walter W. Johnson, Inc. after 1980.

### E.2 The Decline in the Value of Defendant's Interest in Walter W. Johnson & Associates, Inc. from $727,341.00 on June 1, 1982 to Zero on December 6, 1985

The debtor valued his corporation on the basis of information forwarded from State Mutual on his vested and non-vested commissions. The undiscounted value amounted to $727,341.00 on June 1, 1982. On October 29, 1985, State Mutual advised debtor that the correct discounted value of his vested commissions was $227,670.00.

Mr. Johnson pledged the vested commissions due his corporation from State Mutual Insurance Company and valued by that company at $227,670.00, to secure various loans amounting to $265,000.00. Additional liabilities of that corporation brought the total indebtedness to $326,000.00, or approximately $71,000.00 more than the estimated value of corporate assets. Further increases in the amount due by the debtor on various notes payable and mortgages were all documented to the satisfaction of the bankruptcy court.

### F. The Increase in the Amount Due by Debtor Insofar as Notes Payable to Banks of $158,500.00 on June 1, 1982 to $842,826.00 on December 6, 1985

■ The notes payable were reflected as follows:

(a) Whitney National Bank—The original loan on the June 1, 1982 personal financial statement was for $90,000.00. A balance of $22,650.00 shown on the bankruptcy filing consisted of two loans. One loan consisted of a balance of $8,650.00 on a $9,000.00 loan made to the debtor personally and transferred to the corporation through a personal loan from the debtor. The second loan was initially in the amount of $10,000.00 made in order to cover an out-of-court settlement with Peter W. Curtis. That loan was subsequently rolled over and the balance was reflected as $14,000.00 in the bankruptcy filing.

(b) The loans with Hibernia National Bank and Bank of the South were paid off by December 6, 1985.

(c) Jefferson Guaranty—The $90,711.00 balance shown in the bankruptcy filing consisted of three loans.

(1) $71,483.30 of that sum was the balance of a loan in the amount of $75,000.00 made in December of 1982 to pay off the Hibernia loan, make payment on a note to First National Bank of Jefferson and pay accounts payable of the corporation.

(2) $9,000.00 of the $90,711.00 balance shown was the balance due on a $15,000 loan made to allow the debtor to purchase stock in the Jefferson Bank.

(3) $10,228.28 of the balance with Jefferson Guaranty was the remainder of a $25,000.00 loan made to allow the debtor to buy Oliver Daniel's and John Haggins' interests in Aspen Grove Farm.

(d) First National Bank of Commerce in Jefferson Parish—The balance shown in the bankruptcy filing was $190,348.00. (1) $77,347.60 of that balance was the remaining balance on a $100,000.00 line of credit and a loan of $210,034.83. $75,000.00 of that loan was paid to Oliver Daniels and John Haggins on the Aspen Grove Farm. $160,034.83 was distributed by the law firm

of Amatto and Creely. $29,448.00 was distributed to Hibernia National Bank; $53,-226.83 was paid to Century Bank, and $77,-369.99 went to Whitney National Bank. $51,000.00 of the loan from First National Bank of Commerce of Jefferson Parish was loaned to the corporation for overhead expense, $13,000.00 was paid to various horse partnerships for installments due and $6,000.00 was loaned to Tullamore Farms 1981 No. 3. (2) $113,000.00 of the balance of the FNBC of Jefferson loan was the remainder of a $275,000.00 loan to Tullamore Farms Limited Partnership 1982 No. 1.

(e) European American Bank—The balance of this loan was listed as $539,118.05, consisting of a $275,000.00 loan to purchase "Woozley," $225,000.00 to purchase "She's On Top" plus $39,118.05 in interest.

### G. *The Increase in the Amount of Mortgages Payable by Debtor from $184,-500.00 on June 1, 1982 to $493,912.00 on December 6, 1985*

The mortgage increase consisted of a $110,073.00 balance on a loan of $117,-000.00 from Security Homestead, and $320,000.00 loaned by Crescent Federal Savings Bank in order to reduce loans with the European American Bank and FNBC of Jefferson plus interest owed on these loans.

█ Just as the plaintiff pointed out in closing arguments before the bankruptcy court, a "satisfactory" explanation is one that induces a mental attitude of contentment in the court's evaluation of the debtor's explanation. *In re: Shapiro & Ornish,* 37 F.2d at 406. Here, although due to the complexity of the debtor's financial situation over a time period of three years, each and every transaction was not documented, the debtor brought forth sufficient documentation and other evidence to induce a state of contentment with the debtor's explanation in the bankruptcy court, and the creditor, although there was ample opportunity, failed to rebut the debtor's explanation. Unless the bankruptcy court's finding of a satisfactory explanation is clearly erroneous, this Court must affirm the findings of the bankruptcy judge. See *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). This Court finds that the bankruptcy judge's finding of a satisfactory explanation for the debtor's loss of assets is supported by a review of the record, and this Court is likewise content with the debtor's explanation.